**ORAL ARGUMENT REQUESTED**

**No. 24-1942**

---

# United States Court of Appeals for the First Circuit

---

BLUERADIOS, INC., a Colorado corporation,

*Plaintiff - Appellant*,

v.

HAMILTON, BROOK, SMITH & REYNOLDS, P.C., a Massachusetts professional corporation; DAVID J. THIBODEAU, JR., an individual; LAWRENCE P. COGSWELL, III, an individual; GERALD KAZANJIAN, an individual; STEPHEN D. BROOK, as Personal Representative of the Estate of David E. Brook; JOSHUA MATLOFF, an individual; NELSON SCOTT PIERCE, an individual,

*Defendants- Appellees.*

---

*On appeal from the United States District Court
for the District of Massachusetts*
No. 21-cv-10488-DJC
*Honorable Denise J. Casper*

---

**PUBLIC PLAINTIFF-APPELLANT'S OPENING BRIEF**

---

David B. Seserman
Seserman Law LLC
3900 E. Mexico Ave.
Suite 300
Denver, CO 80210
(303) 900-2406

J. Carl Cecere
CECERE PC
6035 McCommas Blvd.
Dallas, Texas 75206
(469) 600-9455
ccecere@cecerepc.com

Douglas W. Salvesen
Sanford F. Rems
Yurko Partners, P.C.
One Tech Drive
Suite 205
Andover, MA 01810

*Attorneys for Plaintiff-Appellant*

## DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1, the undersigned certifies that BlueRadios, Inc. has no parent or affiliates, and no publicly held corporation owns 10% or more of BlueRadios' stock.

/s/ *J. Carl Cecere*

J. Carl Cecere

i

# TABLE OF CONTENTS

Disclosure Statement ................................................................................i

Table of authorities ..................................................................................v

Statement in support of oral argument ...................................................x

Jurisdictional statement ..........................................................................1

Statement of the issues ...........................................................................2

Introduction .............................................................................................3

Statement of the Case .............................................................................6

      A.    BlueRadios and Kopin agree to develop the Golden-i wearable computer. .................................................................6

      B.    BlueRadios and Kopin jointly retain HBSR to represent them in filing numerous patent applications before domestic and international patenting authorities. ...........................9

      C.    Instead of developing the Golden-i units contemplated under the Joint Venture Agreement, Kopin conspires with HBSR to claim exclusive rights to BlueRadios' intellectual property and monetize it with other companies. ...........................13

      D.    Not until BlueRadios sued Kopin in Colorado in 2017 did BlueRadios first learn of HBSR's involvement in the plot to take its ownership rights away. .......................................18

      E.    The district court improperly dismissed BlueRadios' claims as barred by the statute of limitations. ...........................21

Summary of the argument .....................................................................24

Argument ...............................................................................................28

I.    Standard of review ...........................................................................28

II.    BlueRadios formed an attorney-client relationship with HBSR. ..........29

A.  HBSR had to be in an attorney-client relationship with BlueRadios to prosecute patents on its behalf.................................29

B.  The evidence raises at least genuine issues of material fact on whether HBSR had an attorney-client relationship with BlueRadios. ............................................................................33

III.  BlueRadios' relationship with HBSR tolled limitations on all of BlueRadios' claims. .............................................................41

IV.  BlueRadios' claims are timely under the discovery rule..........................45

A.  BlueRadios did not learn the facts necessary to trigger limitations until 2017, when it uncovered the plot between Kopin and HBSR to deprive BlueRadios of its ownership rights in the Golden-i intellectual property.....................................45

B.  Misstating inventorship in a patent application cannot constitute the harm necessary for limitations to accrue...............47

C.  Nothing that BlueRadios learned in the 2008-2009 timeframe gave it notice of any injury or HBSR's malpractice. ........................................................................52

1.  HBSR's undisclosed amendments to, and abandonment of, the parties' joint patent applications did not give BlueRadios notice of HBSR's malfeasance. ........................................................52

2.  The patent applications BlueRadios received did not, and could not, convey limitations-triggering notice. ..........54

3.  The issue with the '090 Provisional Patent Application did not put BlueRadios on notice of HBSR's malpractice. ...........................................................59

D.  Nothing that occurred during Klobucar's 2014 limited search of the Golden-i patent portfolio gave BlueRadios limitation-triggering notice. ............................................................62

Conclusion...................................................................................1

iii

Certificate of compliance ........................................................................2

Certificate of service............................................................................3

# TABLE OF AUTHORITIES

## Cases

*Beasley v. Avery Dennison Corp.,*
　No. SA-04-CA-0866, 2006 WL 2854396 (W.D. Tex. Oct. 4, 2006) ................32

*Cantu v. St. Paul Cos.,*
　514 N.E.2d 666 (Mass. 1987).........................................................................47

*Cheswell, Inc. v. Premier Homes and Land Corp.,*
　319 F. Supp. 2d 144 (D. Mass. 2004) .............................................................50

*Comm. v. L.A.L. Corp.,*
　511 N.E.2d 599 (Mass. 1987)..........................................................................41

*Continental Grain Co. v. Puerto Rico Maritime Shipping Authority,*
　972 F.2d 426 (1st Cir. 1992)............................................................................46

*Davalos v. Bay Watch, Inc.,*
　No. SJC-13534, 2024 WL 4031129 (Mass. Sept. 4, 2024).........................25, 61

*Demoulas v. Demoulas Super Markets, Inc.,*
　677 N.E.2d 159 (Mass. 1997).........................................................................48

*DeVaux v. Am. Home Assur. Co.,*
　444 N.E.2d 355 (Mass. 1983)..............................................................36, 40, 43

*Doe v. Creighton,*
　439 Mass. 281 (2003) ......................................................................................74

*Eck v. Kellem,*
　51 Mass. App. Ct. 850 (2001)....................................................................57, 62

*Energy Creates Energy, LLC v. Brinks Gilson Lione, P.C.,*
　No. 4:18-cv-00913-DGK, 2020 WL 12702546 (W.D. Mo. Aug. 26, 2020) ......32

*Gagnon v. Coombs,*
　654 N.E.2d 54 (Mass. App. Ct. 1995) ............................................................49

*Geo. Knight & Co. v. Watson Wyatt & Co.,*
　170 F.3d 210 (1st Cir. 1999)............................................................................64

*Gilead Servs., Inc. v. United States,*
  151 Fed. Cl. 742 (2020)................................................................55, 58

*Hendrickson v. Sears,*
  310 N.E.2d 131 (Mass. 1974)......................................................24, 63

*Hillerich Bradsby Co. v. MacKay,*
  26 F. Supp. 2d 124 (D.D.C. 1998).................................................3, 32

*Hor v. Chu,*
  699 F.3d 1331 (Fed. Cir. 2012)...................................................29, 54

*In re Regents of the Univ. of Cal.,*
  101 F.3d 1386 (Fed. Cir. 1996)...........................................................33

*Instant Image Print Shop, Inc. v. Lavigne, Keating, Halstead, Inc.,*
  No. 97WAD005, 1998 WL 201424 (1998 Mass. App. Div. 74,
  Apr. 15, 1998)........................................................................................45

*Int'l Mobiles Corp. v. Curron & Black/Fairfield & Ellis, Inc.,*
  560 N.E.2d 122 (Mass. App. Ct. 1990) .............................................51

*Int'l Strategies, Inc. v. Greenberg Traurig,*
  482 F.3d 1 (1st Cir. 2007)...................................................................38

*Javo Beverage Co. v. California Extraction Ventures, Inc.,*
  19-Civ-1859, 2019 WL 6467802 (S.D. Cal. Dec. 2, 2019) ...............56

*Loop AI Labs Inc. v. Gatti,*
  No. 15-cv-00798-HSG, 2016 WL 730211 (N.D. Cal. Feb. 24, 2016) .............32

*Martinez v. Novo Nordisk Inc.,*
  992 F.3d 12 (1st Cir. 2021)..................................................................30

*Mass. Eye & Ear Infirmary v. QLT Phototherapeutics, Inc.,*
  167 F. Supp. 2d 108, 117 (D. Mass. 2001) ........................................42

*Mass. Eye & Ear Infirmary v. QLT Phototherapeutics, Inc.,*
  412 F.3d 215 (1st Cir. 2005)..........................................................32, 68

*Mass. Housing Opportunities Corp. v. Whitman & Bingham Assocs., P.C.,*
  983 N.E.2d 734 (Mass. 2013).............................................................52

*Max-Planck-Gesellschaft Zur Foerderung der Wissenschaften E.V. v. Wolf Greenfield & Sacks, PC,*
736 F. Supp. 2d 353 (D. Mass. 2010) ...................................................................44

*Merck Eprova Ag v. Prothera, Inc.,*
670 F. Supp. 2d 201 (S.D.N.Y. 2009) ..............................................4, 27, 31, 40

*Mueller Brass Co. v. Reading Indus., Inc.,*
352 F. Supp. 1357 (E.D. Pa. 1972) .....................................................................65

*Murphy v. Smith,*
579 N.E.2d 165 (Mass. 1991) .......................................................................43, 46

*Naturalock Solutions, LLC v. Baxter Healthcare Corp.,*
No. 14-cv-10113, 2016 WL 2958374 (N.D. Ill. May 22, 2016) .......................32

*Nova Assignments, Inc. v. Kunian,*
928 N.E.2d 364 (Mass. App. Ct. 2010) .............................................................49

*Pro Marketing Sales, Inc. v. Securion Sys., Inc.* No. 1:19-cv-00113, 2021
WL 1987192 (D. Utah May 17, 2021) ...............................................................56

*Robertson v. Gaston Snow & Ely Bartlett,*
536 N.E.2d 344 (Mass. 1989) .............................................................................49

*Rosen Constr. Ventures, Inc. v. Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.,*
364 F.3d 399 (1st Cir. 2004) ...............................................................................63

*Sheinkopf v. Stone,*
927 F.2d 1259 (1st Cir. 1991) .......................................................................41, 45

*Spatorico v. Egan, Flanagan & Cohen, P.C.,*
No. 19-cv-30090-KAR, 2022 WL 4586465 (D. Mass. Sept. 29, 2022) ............48

*Sperry v. Florida ex rel. Florida Bar,*
373 US 379 (1963) ...............................................................................................33

*Stark v. Advanced Magnetics, Inc.,*
29 F.3d 1570 (Fed. Cir. 1994) .....................................................................55, 58

*Sun Studs, Inc. v. Applied Theory Assocs.*,
    772 F.2d 1557 (Fed. Cir. 1985) ..................................................35, 38

*Taygeta Corp. v. Varian Assocs., Inc.*,
    763 N.E.2d 1053 (Mass. 2002).................................................52

*Torres Vargas v. Santiago Cummings*,
    149 F.3d 29 (1st Cir. 1998).....................................................30

*Williams v. Ely*,
    668 N.E.2d 799 (Mass. 1996) ...............................................51, 60

*Wise v. Hubbard*,
    769 F.2d 1 (1st Cir. 1985).....................................................60

*Wright v. Rinaldo*,
    761 N.W.2d 114 (Mich. App. 2008) ........................................31

## Statutes

28 U.S.C. §1291 ...............................................................................1

28 U.S.C. §1332 ...............................................................................1

Mass. Gen. Laws. ch. 260 § 12 .......................................................44

## Regulations

37 C.F.R. § 1.112 ............................................................................48

37 C.F.R. § 1.34 ..............................................................................31

37 C.F.R. § 1.45 ..............................................................................14

## Rule

Mass. Rule Prof. Conduct 1.4 .........................................................52

## Other Authorities

David M. Epstein, *Eckstro's Licensing in Foreign and Domestic Operations*
    (2021)................................................................................54

Intel, *What Is Bluetooth® Technology?*, https://bit.ly/41anbgL ...................... 7

Lenovo, *What is packet switching?*,  https://bit.ly/4gBZX7X ........................... 7

Pitchbook, *RealWear Overview*,
    https://pitchbook.com/profiles/company/168566-50. ..................................... 18

Restatement (Third) Agency § 1 cmt. c ...................................................... 39

U.S. Patent & Trademark Office, *Manual of Patent Examining Procedure* §
    201.04 (9th ed. 2014). ........................................................................... 18

## STATEMENT IN SUPPORT OF ORAL ARGUMENT

Appellant BlueRadios, Inc. requests oral argument. The record in this case is extensive—with an appendix numbering 17 volumes. The legal and factual issues involved are also complex, concerning allegations of malpractice committed in the course of filing patent applications with the U.S. Patent & Trademark Office—a factually, legally, and procedurally complicated process that requires specialized expertise to understand, that most judges on this Court are unlikely to have. Furthermore, the Court's answers to these questions will not only have significant consequences for BlueRadios, which has suffered the loss of its rights of inventorship, and over $100 million in damages, as the result of its attorneys' malfeasance, but will also have consequences for many other inventors and participants in joint ventures. BlueRadios therefore believes that oral argument will be beneficial in helping the Court resolve this case.

## JURISDICTIONAL STATEMENT

BlueRadios, a Colorado corporation, brought this legal malpractice action against the law firm of Hamilton, Brook, Smith & Reynolds and attorneys David J. Thibodeau, Jr., Lawrence P. Cogswell III, Gerald Kazanjian, David E. Brook, Joshua Matloff, and Nelson Scott Pierce (collectively "HBSR"), all of which were Massachusetts residents. The district court had jurisdiction based on of diversity of citizenship under 28 U.S.C. §1332.

The district court dismissed BlueRadios' claims on summary judgment based on HBSR's limitations defense on September 18, 2024. ADD1-37. On October 15, 2024, BlueRadios timely appealed that final judgment to this Court (A4161), which has jurisdiction over this appeal under 28 U.S.C. §1291.

## STATEMENT OF THE ISSUES

I.    Did the district court err in determining that BlueRadios never formed an attorney-client relationship with HBSR and in holding that this relationship did not extend to all of the attorneys who performed work on BlueRadios' behalf?

II.   Did the district court err in concluding that "continuing representation" doctrine did not toll the statute of limitations on BlueRadios' legal malpractice claims when BlueRadios' attorney-client relationship with HBSR existed during the acts and occurrences in question and that relationship never terminated?

III.  Did the district court err in concluding that BlueRadios' claims against HBSR were untimely when:

a.   BlueRadios suffered no limitations-triggering injury outside the limitations period;

b.   BlueRadios did not learn the information necessary to trigger limitations until 2017, well within the limitations period; and

c.   there is no evidence, much less conclusive evidence suggesting otherwise?

## INTRODUCTION

This appeal concerns a joint venture between BlueRadios and Kopin Corporation to develop a device called the "Golden-i" that devolved into a scheme by Kopin to deprive BlueRadios of the intellectual property it developed for the venture—using BlueRadios' own lawyers at HBSR to do so.

When Kopin and BlueRadios joined forces to develop the Golden-i, BlueRadios contractually allocated to Kopin the responsibilities of obtaining patents to protect the intellectual property developed during the venture, paying the lawyers necessary to obtain those patents, and handling most communications with lawyers.

Such allocations of the responsibility for retaining attorneys are common in joint ventures. In such circumstances, courts have "long recognized" that even when only one venture member is solely responsible for engaging and interacting with the attorneys, the attorney-client relationship nonetheless encompasses all venture members—a joint representation arising from their "common legal cause." *Hillerich Bradsby Co. v. MacKay*, 26 F. Supp. 2d 124, 126 (D.D.C. 1998) (citing cases). Parties frequently "elect joint representation," especially "in the context of the joint ownership of patents." *Merck Eprova Ag v. Prothera, Inc.*, 670 F. Supp. 2d 201, 211 n.4 (S.D.N.Y.

2009). Accordingly, "where two parties are jointly prosecuting a patent application, they are commonly considered to be joint clients" of the lawyer filing the application—the same as if they were a "husband and wife" transacting in a matter concerning their community property, or indeed, parties pursuing a single lawsuit. *Id.* at 211.

HBSR recognized that a joint representation existed in this case, repeatedly representing itself to be BlueRadios' lawyers and filing patent applications on its behalf. Indeed, the first application HBSR prepared listed *only* BlueRadios inventors—an arrangement that would only be possible if HBSR represented BlueRadios. Kopin also acknowledged the existence of this joint representation, as did Judge John Kane of the U.S. District Court for the District of Colorado, who held that HBSR "indubitably" represented BlueRadios in separate litigation between Kopin and BlueRadios. A420.

The district court in this case disregarded the uniform holdings of courts around the country about joint representations in joint ventures, and the uniform conclusions of those who have examined the joint representation at issue in this case. It held that BlueRadios lacked an attorney-client relationship with HBSR simply because BlueRadios did not initiate the relationship with HBSR or pay directly for its services. ADD34-35.

4

Consequently, when HBSR turned against BlueRadios and secretly plotted with Kopin to deprive BlueRadios of its ownership of Golden-i developments and intellectual property by surreptitiously changing a series of patent applications to remove BlueRadios' contributions, the district court determined that BlueRadios lacked any recourse against HBSR. The district court ruled that the absence of any attorney-client relationship between BlueRadios and HBSR deprived BlueRadios of any entitlement to pursue attorney malpractice claims against HBSR and denied BlueRadios the protection of the "continuing representation" doctrine, which tolls limitations during the pendency of an attorney-client relationship.

The district court then compounded this failure with another, holding that BlueRadios' malpractice claims against HBSR accrued as a matter of law when the improperly amended applications were filed in 2008, even though those changes occurred in secret, BlueRadios experienced no harm from the errors on those applications, and the inventors and engineers at BlueRadios, a small startup with only three employees, possessed neither reason to suspect nor the ability to understand the complex issues that made inventorship on the applications problematic. BlueRadios' inventors would not actually discover the problems with the applications, or HBSR's involvement in Kopin's plot to

deprive BlueRadios of its ownership interest in the Golden-i developments until many years later—well within the limitations period—and BlueRadios needed help from an attorney to make that discovery.

The district court's errors resulted because it overlooked critical distinctions between patent applications and issued patents; failed to appreciate how joint applications generally work; and plainly violated its obligation to take the facts in the light most favorable to the nonmovant. Those erroneous holdings have caused BlueRadios great harm, depriving it of more than $100 million in damages. A7445. If the manifestly unreasonable and improper rules the district court adopted are left standing, many other inventors and joint venturers will be harmed too. It is therefore vital for the Court to reverse the decision below.

## STATEMENT OF THE CASE

### A. BlueRadios and Kopin agree to develop the Golden-i wearable computer.

In 2006, Kopin, a manufacturer of micro-displays (ADD3), began a project to develop a wearable computing device with a small display located in an eyepiece that could be controlled through voice commands (A6327). Kopin sought out BlueRadios, an engineering firm, for assistance in developing this device. A6380. After the parties entered into a non-disclosure agreement

(A6384, A6227), Kopin realized that BlueRadios had developed revolutionary technologies for wirelessly transmitting massive amounts of data and creating miniature, compact circuit boards (A4240, A6388, A6391). These technologies included specific algorithms for "packet-switching" (A1929-30): a method of transmitting data by breaking it into small individually optimized "packets" and sending each one independently.[1] Although BlueRadios developed these technologies specifically for use over "Bluetooth" connections, which allow electronic devices to connect wirelessly over short distances,[2] its technologies could be ███████████████████████ including ████████ A6388.

The parties decided to marry Kopin's micro-displays with BlueRadios' ground-breaking developments and dubbed the project the "Golden-i." A1858.

---

[1] Lenovo, *What is packet switching?*, https://bit.ly/4gBZX7X.

[2] Intel, *What Is Bluetooth® Technology?*, https://bit.ly/41anbgL.



Within months of their initial conversations, Kopin and BlueRadios entered a contract to jointly develop the Golden-i. ADD4. Under this agreement (the "Joint Venture Agreement"), BlueRadios retained "all rights, title and interest" in intellectual property it brought into the venture, although Kopin obtained the exclusive right to use BlueRadios' pre-existing intellectual property on the Golden-i Project. ADD4; A2549. Any "intellectual property rights" that BlueRadios "developed" during the Golden-i Project would be "jointly owned" by both parties. *Id.* BlueRadios assigned Kopin both the "right" and the "responsibility" to "file for, procure and maintain [patents for the venture] at Kopin's expense," and Kopin promised to pay BlueRadios a per-unit royalty along with a fixed retainer of $35,000 per month. A2548, A2549.

**B.** **BlueRadios and Kopin jointly retain HBSR to represent them in filing numerous patent applications before domestic and international patenting authorities.**

Pursuant to the Joint Venture Agreement, Kopin decided to obtain patent protection for several Golden-i developments (A6392-93), and suggested using attorneys at HBSR, whom Kopin had used in the past, to prosecute those patents. A6326, A6333-34. In 2007, HBSR began preparing patent applications ███████████████████████████ A4241 (citing A4308). Kopin's founder and CEO, John Fan emphasized to HBSR the importance and likely success of the Golden-i Project and advised HBSR to ███████████ related to the project ████████████ A6384-85, A8421.

While HBSR entered no engagement agreement with either Kopin or BlueRadios (A8687), the parties conducted themselves as if HBSR jointly represented BlueRadios *and* Kopin. HBSR attorneys analyzed the executed Joint Venture Agreement and therefore knew Kopin was pursuing patents for technologies belonging to both parties. A1925 (citing Dkt.234-79); A4267. HBSR opened billing files for BlueRadios (A4244, A4262) and BlueRadios employees executed formal powers of attorney empowering HBSR to prosecute patents on BlueRadios' behalf (A677, A763, A1804, A2113, A4249-

9

50, A4256-57). During preparation of the applications for those patents, BlueRadios disclosed its most carefully guarded trade secrets to HBSR (A4245, A607-09, A4334, A6395), including such extraordinarily sensitive matters as how BlueRadios was ████████████████████████ — disclosures BlueRadios made only because it believed HBSR represented it (A4247, A43430).

The patent applications HBSR prepared included numerous BlueRadios developments, including claims explicitly referencing a device containing a "packet-switching gateway" using an "appropriate proxy," as well as numerous figures and drawings BlueRadios provided to HBSR describing the hardware and software components necessary to enable those technologies. A222, A638-664, A4333, A1910, A1929-31, A6386, A6392.

During this process, BlueRadios communicated regularly with HBSR. A8426-61. Most of these communications were filtered through Jacobsen, Kopin's Golden-i project manager, simply because Jacobsen asked for communications to go through him. A536, A589-90, A610, A633-34 A1927. Jacobsen nevertheless made clear that BlueRadios' team could—and should— speak directly with HBSR: ████████████████████████ ████████████████ A4250, A4394, A5817, A5308, A8130.

Pursuant to that open-communication policy, BlueRadios had numerous communications with HBSR without Kopin present. Indeed, at the initial kickoff meeting for the Golden-i Project, only HBSR and BlueRadios representatives attended. A6394-95; A5121, A5804, A6548. BlueRadios also made several requests for individualized legal advice and assistance directly from HBSR, including on such matters as areas of patentability, patent strategy, the status of applications, whether certain patent applications should be broadened to protect BlueRadios' rights, and the possible inclusion of additional inventors on applications. A537, A540, A4584, A4394-98, A4256, A4179; Dkt.212 at 12-13; A1866.

Perhaps most importantly, at no time did HBSR give BlueRadios any indication that it solely represented Kopin, that BlueRadios was not HBSR's client, or that BlueRadios should obtain separate counsel—even though HBSR's own lawyers recognized that they should do so if BlueRadios was not a client. A8171, A8348, A8688.

Pursuant to this dual-representation arrangement, HBSR commenced filing patent applications in 2008 related to the Golden-i Project and naming BlueRadios inventors. This began with two "provisional" patent applications— No. 61/010,177 (the "'**177 Provisional Patent Application**") and No.

11

61/010,090 (the "'090 **Provisional Patent Application**"). Provisional applications never ripen into true patents. They merely serve as "placeholder[s]" to establish priority over other potential inventors. U.S. Patent & Trademark Office, *Manual of Patent Examining Procedure* § 201.04 (9th ed. 2014) ("*MPEP*"). The first of these provisionals, the **'177**, named only BlueRadios inventors (*see* ADD7-12; A677-78) and referenced technologies that BlueRadios brought into the venture—therefore incorporating developments *solely* owned by BlueRadios under the Joint Venture Agreement. A538, A704, A1939 (citing Dkt.234-38 at 19).

In addition to these provisional applications, HBSR filed a series of regular patent applications with the USPTO, and another set of applications with the World Intellectual Property Organization ("WIPO") (A1940 (citing Dkt.234-97)) under the "Patent Cooperation Treaty" ("PCT"), which preserved the parties' ability to obtain patents in numerous foreign countries.[3] In correspondence related to these "PCT" patent applications, HBSR held itself out as the "Attorney" for a BlueRadios employee. A545, A827.

Meanwhile, BlueRadios provided all the deliverables required under the Joint Venture Agreement. A1922, A2548 (citing Dkt.3 at 13-14).

---

[3] See WIPO, PCT-*The International Patent System*, https://www.wipo.int/pct/en/.

C.    **Instead of developing the Golden-i units contemplated under the Joint Venture Agreement, Kopin conspires with HBSR to claim exclusive rights to BlueRadios' intellectual property and monetize it with other companies.**

Kopin, however, struggled on its end of the deal—failing either to produce Golden-i units or find a market for the product. A209. Yet Kopin knew the technology BlueRadios had developed for the Golden-i was extremely valuable, so it began looking for other ways to monetize BlueRadios' technology—while excluding BlueRadios.

HBSR chose to aid Kopin in that strategy. That choice was unsurprising, because unbeknownst to BlueRadios, David Brook, an HBSR founding partner who oversaw the Golden-i legal work, was at all times the secretary of Kopin's Board of Directors and held a multi-million-dollar stock position in Kopin (which he liquidated immediately before BlueRadios sued HBSR). A55-56, A8659, A8465. That gave HBSR financial incentive to help Kopin profit at BlueRadios' expense, by helping Kopin deprive BlueRadios of its intellectual property rights and misappropriate BlueRadios' extraordinarily valuable technologies.

This was not easily done, because the parties were co-inventors and co-owners of developments in a ███████████ of overlapping patent applications, and Kopin could not terminate the Joint Venture Agreement without losing its

exclusive license to use BlueRadios' unique and exceptionally valuable technology.

HBSR began developing a "strategy for separating Kopin and BlueRadios inventions" and "handling" any "BlueRadios" "related claims" to ownership in Golden-i technologies—mere months after filing a series of patent applications naming both BlueRadios and Kopin inventors. *See* A6410 (citing Dkt.234-79), A6577, A6291.

As part of this strategy, HBSR made surreptitious changes to several patent applications it had previously filed on BlueRadios' behalf to diminish or eliminate BlueRadios' contributions—without ever informing BlueRadios of the changes. In one application, No. 12/152,462 (the "**'462 Application**"), HBSR originally listed Wilfred Tucker (BlueRadios co-founder and CTO) and John Sample (BlueRadios employee) as inventors and asked Tucker to sign a declaration accompanying the application confirming their inventive contributions (as required for a joint application under 37 C.F.R. § 1.45). ADD9; A540, A4583-84, A1763-64. HBSR also named Tucker and Sample on a virtually identical international application to the '462, PCT/US08/06147 (the "**'147 PCT Application**"), which it filed on the same day as the '462. ADD12; A2107, A6409. Yet HBSR never filed the declaration signed by the BlueRadios

inventors. Instead, it submitted one naming only Kopin inventors (ADD9 (citing Dkt.247-1, ¶43a)), and amended the '462 Application to remove Tucker and Sample as inventors and to disclaim any priority based on the '177 Provisional Application—a move that potentially harmed *Kopin's own* ownership rights—simply to remove any admission of BlueRadios' inventive contributions (ADD10-11 n.8 (citing Dkt.247-1, ¶24)).

HBSR didn't stop there. HBSR similarly amended another application, No. 12/348,646 (the "**'646 Application**"), to delete Tucker and Sample (ADD12-13), and then took the even more extraordinary steps of *abandoning* several applications, including the '147 PCT, (ADD12; A1640, A1803, A1806), and filing "terminal disclaimers" on several others in which it claimed Kopin 100% owned the application, which was 100% false (*see, e.g.*, A8896).

On numerous occasions, HBSR and Kopin discussed whether BlueRadios should be informed of these changes. *See, e.g.*, ADD12-13 (citing Dkt.247-1, ¶197); *see also* A6412 (citing Dkt.234-120); A6413 (citing A6413); A6582-83, A7172, A8737. At each turn, they elected to keep BlueRadios in the dark instead. ADD9, ADD12-13; A8172, A8349-50.

Yet even after removing BlueRadios' *inventors* from the applications, HBSR still could not remove BlueRadios' *developments* from the applications.

Some applications continued to claim the benefit of the '177 Provisional (listing only BlueRadios inventors). A4257. The remainder of those applications either retained the tell-tale language referencing BlueRadios' proprietary "packet switching gateway" technology, the diagrams BlueRadios had created to explain that technology, or both. *See, e.g.*, A1903-05 (citing Dkt.234-44 at 49, Dkt.234-47 at 5), A1929, A1933. Accordingly, the applications still relied extensively on technology that BlueRadios developed before or during the Golden-i Project—and therefore were at least co-owned by BlueRadios under the Joint Venture Agreement.

HBSR ultimately obtained 46 patents for Kopin that contained BlueRadios' technology but failed to recognize BlueRadios' inventorship or ownership rights. A1932 (citing A7473). This theft was so severe that in the Colorado litigation, Kopin was forced to amend the two patents that resulted from the '462 and '646 Applications to add Tucker and Sample as inventors. A1930-31. But these belated changes could not prevent BlueRadios from losing *all but 3 years* of benefit from the patents' fixed 20-year terms.

Meanwhile, Kopin used HBSR's amendments to the applications to justify using BlueRadios' developments without paying for them. As early as July 2009, Kopin (with HBSR's assistance) began successfully licensing

BlueRadios' property to companies such as Motorola, Verizon, and Fujitsu. A111. Indeed, "RealWear," a company begun by Christopher Parkinson, former employee of both Kopin and BlueRadios, currently uses Golden-i technology in a commercial version of the Golden-i, and is now valued at over $370 million.[4]  A107-08, A111.



The Joint Venture Agreement never terminated and HBSR continues to file for and procure patents containing BlueRadios' developments.. Indeed, as recently as August 2024, HBSR filed a patent application (No.18/591,586) containing a diagram that first appeared in a provisional application, No. 61/176,662, which listed Parkinson as an inventor that was filed at a time when he was a BlueRadios employee and had assigned his inventive rights to BlueRadios (A1877-78):

---

[4] Pitchbook, *RealWear Overview*, https://pitchbook.com/profiles/company/168566-50.

(Modified)



### D. Not until BlueRadios sued Kopin in Colorado in 2017 did BlueRadios first learn of HBSR's involvement in the plot to take its ownership rights away.

Kopin's plot with HBSR to secretly deprive BlueRadios of its ownership interest in the Golden-i intellectual property proved a resounding success. BlueRadios had no clue that HBSR was not acting in its best interest until September 2016 when HBSR entered an appearance on behalf of Kopin in the lawsuit BlueRadios filed against Kopin. A1909 (citing A8173-74). Only then did BlueRadios begin to question HBSR's loyalty, promptly moving to disqualify HBSR from representing Kopin. A1909 (citing Dkt.234-59). The Colorado district court swiftly granted that motion (Dkt.234-59), holding that HBSR

could not represent Kopin because it also represented BlueRadios in prosecuting several patents: "HBSR was completely aware that it was acting as an attorney for both" BlueRadios and Kopin "in so far as the preparation, filing and perfecting of rights in the patent applications was concerned." Dkt. 234-59 at 5, A1909, A8766-67. The Colorado court then reaffirmed the existence of an attorney-client relationship between HBSR and BlueRadios in several more orders. A420, A845-46, A1909.

It was not until 2017, during discovery in the Colorado litigation, that BlueRadios first learned of HBSR's malfeasance (A1909, A8173-74), and its connection to events that had occurred years earlier, in late 2014, when Kramer sought to determine the value of BlueRadios' interest in the Golden-i patent portfolio after being contacted by Google about a potential acquisition. A1906 (citing Dkt.234-3 at 69). Because Kramer did not know how to locate these patents himself, he asked an attorney who had been working for BlueRadios on matters unrelated to Golden-i, James Klobucar, to do so. Klobucar identified one patent and two pending applications and reported his findings in a letter to BlueRadios in "mid-December" 2014. ADD24 (citing A2460), A9075. At that time, neither BlueRadios nor Klobucar had any reason

to suspect there were any issues regarding ownership of the patent portfolio. A8173, Dkt.234-24 at 2, A4098-102.

It was only upon receipt of Klobucar's findings in mid-December 2014—well within the limitations period—that Kramer at BlueRadios first discovered potential issues with the Golden-i patent portfolio, noting: "[W]e couldn't find our names on patents that we were claimed to be put on from Kopin and our patent attorney[s at] HBSR." ADD13 (quoting A2156-57). Klobucar sent several letters to HBSR noting these "inconsistencies and inaccuracies." Dkt.234-25 at 9; ADD14. Each time, Klobucar was met with HBSR's assurances that ██████████████████████████████████ ████████████████████████████████ A6377-78 (quoting Dkt.234-26), A6517.

BlueRadios would not learn that these assurances were false, and HBSR was responsible for issues in the Golden-i patent applications, until discovery in the Colorado litigation. A8173-74. Upon making that discovery, BlueRadios acted immediately to protect its rights by entering into a series of tolling agreements with HBSR, beginning in 2017, preserving any claims that would have been timely as of December 5, 2017. Dkt.234-33 at 2. In the Kopin trial,

the jury awarded BlueRadios $24.8 million in damages for Kopin's willful and malicious conduct.

Yet there would be a very different result in this case. On March 22, 2021, BlueRadios sued HBSR in a Massachusetts federal district court. ADD1. Because Massachusetts has a three-year statute of limitations for legal malpractice claims, BlueRadios' claims were therefore timely if they accrued on or after December 5, 2014. *See* ADD15-16.

### E.     The district court improperly dismissed BlueRadios' claims as barred by the statute of limitations.

The district court dismissed BlueRadios' claims on limitations grounds in a memorandum opinion that directly and inexplicably conflicts with the holding of the Colorado district court and BlueRadios' tolling agreements with HBSR.

In Massachusetts, malpractice claims are subject to the "discovery rule," by which claims arise only when the client learns, or should have learned, that she has been harmed as the result of another's wrongdoing—and that her attorneys had a hand in the injury. ADD17. A plaintiff asserting a legal malpractice claim in Massachusetts also enjoys the "continuing representation doctrine," which provides that the statute of limitations for legal malpractice claims does not run until the attorney-client relationship has

ended. *See* ADD27. Yet the district court concluded that BlueRadios could not avail itself of the continuing representation doctrine because BlueRadios had never been HBSR's client as a matter of law. The court was unmoved by HBSR's numerous representations, and the Colorado district court's rulings, that Appellees *were* BlueRadios attorneys—and, in fact, had to be in order to file patent applications on BlueRadios' behalf.

Instead, the district court focused exclusively on the fact that BlueRadios did not engage HBSR *itself*, but did so through Kopin, which had been contractually tasked with obtaining legal services on BlueRadios' behalf under the Joint Venture Agreement. The district court therefore decided that BlueRadios never made "individualized" requests for "advice or assistance" necessary for an attorney-client relationship under Massachusetts law— despite the numerous communications that BlueRadios employees had with HBSR attorneys *seeking their advice and assistance* in filing patent applications. ADD.34. The district court also determined that any attorney-client relationship between BlueRadios and HBSR ended in 2009, even though the Joint Venture Agreement remains in force today and HBSR continues to prosecute patents containing BlueRadios' developments (thereby representing BlueRadios) for years after that date. *See supra* at 17-18.

22

The district court independently determined that BlueRadios lacked the "innocen[t] reliance" necessary for the continuing representation doctrine, and all of BlueRadios' claims were barred by limitations under the discovery rule. ADD17, ADD27. The district court cited to Massachusetts law providing that with "rare exception," the issue of "[w]hether a plaintiff knew or should have known of an injury" is one that only a jury can decide—and is not amenable to summary judgment. ADD16 (citing *Hendrickson v. Sears*, 310 N.E.2d 131 (Mass. 1974)). The court nevertheless resolved the question as a matter of law, determining that the limitations period began running on BlueRadios' claims as early as 2008, when HBSR first began filing amendments to the patent applications to remove BlueRadios inventors. While HBSR successfully kept BlueRadios from learning of those changes, the court decided that BlueRadios nonetheless obtained "constructive notice" of them because the applications were publicly available on the USPTO website. ADD17, ADD31. This despite acknowledging that Massachusetts applies no concept of "constructive notice" for the discovery rule. ADD22 n.14 (citing *Davalos v. Bay Watch, Inc.*, No. SJC-13534, 2024 WL 4031129 (Mass. Sept. 4, 2024)).

The court also determined that BlueRadios had obtained notice of the plot between Kopin and HBSR when a BlueRadios employee voiced concern in 2008 about whether it was "sort of reckless" to omit BlueRadios inventors from the '090 Provisional Patent Application, even though the supposed omissions occurred on a mere provisional patent application, and after raising this concern, BlueRadios received assurances from Kopin that its concerns with the '090 Application would be properly addressed. *See* ADD8-9 (citing A8408-09), ADD18; A6371, A5453, A7448-49, A8936.

Finally, the district court held that BlueRadios' claims were time-barred as the result of Klobucar's initial inquiry into the Golden-i patent portfolio (ADD23-24), even though BlueRadios insisted on making its tolling agreement with HBSR effective to preserve claims accruing after December 5, 2014 precisely to ensure that Klobucar's findings from his inquiry (which were not reported to BlueRadios until *mid-December* 2014), would not affect the timeliness of its malpractice claims.

## SUMMARY OF THE ARGUMENT

The district court's errors in this case are numerous and important to correct. The district court's conclusion that BlueRadios had no attorney-client relationship with HBSR has a dual consequence, both depriving BlueRadios

of any substantive malpractice claim and denying it the benefit of the continuing representation doctrine. That conclusion is incorrect.

There should be no question that an attorney-client relationship exists in this case. The very first application HBSR filed on the Golden-i Project (the '177) listed only BlueRadios inventors—the first of numerous representations in which Kopin and HBSR represented that HBSR had an attorney-client relationship with BlueRadios. The parties also *behaved* at all times toward BlueRadios as if HBSR represented both BlueRadios and Kopin. These facts led the Colorado district court to conclude that HBSR represented both Kopin and BlueRadios and were equally conclusive of that representation in this case—or at least raised genuine issues of material fact on the question.

Despite what the court below concluded, the existence of that attorney-relationship is in no way undermined by the fact that Kopin, rather than BlueRadios, handled most of the interactions with HBSR. Such arrangements are common in joint ventures—especially in joint patent prosecutions. It has long been understood that where one member of a joint venture engages a lawyer to jointly prosecute patents, it does so on behalf of all members in the venture. *See Merck Eprova Ag v. Prothera, Inc.*, 670 F. Supp. 2d 201, 211 (S.D.N.Y. 2009).

That rule controls this case. BlueRadios assigned Kopin the task of engaging legal counsel under the Joint Venture Agreement, so when Kopin initiated an attorney-client relationship with HBSR and made "individualized" requests for legal advice, it did so both for itself *and* for BlueRadios. BlueRadios also made numerous individualized requests for legal advice and assistance of its own: both directly and through Kopin—so often as to fill up a 25-page list in the summary-judgment record. This evidence raises at least genuine issues of material fact on whether HBSR had an attorney-client relationship with BlueRadios. Indeed, that evidence is conclusive, meaning summary judgment should have been granted in BlueRadios' favor on the existence of the attorney-client relationship.

Genuine issues of material fact also exist on whether that attorney-client relationship ended in 2009, as the district court assumed, simply because BlueRadios and HBSR never corresponded directly after that point. Especially when HBSR continued to prosecute patents containing BlueRadios developments long after December 4, 2014, and therefore continuing the vitality of the attorney-client relationship well into the limitations period provided under BlueRadios' tolling agreements with HBSR. The district court erred in concluding otherwise.

The district court similarly erred in holding that limitations expired on BlueRadios' claims under the discovery rule. The evidence in this case supports only one inference: BlueRadios only learned of the plot to deprive BlueRadios of its ownership interest in the Golden-i intellectual property, and HBSR's involvement in that plot, in 2017, when it first learned that HBSR had taken action to deny BlueRadios' ownership interest to benefit Kopin. That discovery occurred well within the limitations period.

By contrast, there is no evidence, much less *conclusive* evidence, to suggest that limitations accrued any time before 2017 so as to make BlueRadios' claims time barred as a matter of law. Limitations could not have accrued in the 2008-2009 time period, when HBSR first began surreptitiously amending patent applications to BlueRadios' detriment. Not only did HBSR *hide* those changes from BlueRadios, making them undiscoverable, but those applications were legally incapable of causing any limitations-triggering injury—and could not do so until an actual patent issued. *See Hor v. Chu*, 699 F.3d 1331, 1335 (Fed. Cir. 2012). The inventors at BlueRadios also had no way of knowing that any of the applications contained errors (and certainly could not be deemed to have such knowledge as a matter of law)—especially when

HBSR and Kopin both repeatedly assured BlueRadios that inventorship was correct.

The events surrounding Klobucar's inquiry into the Golden-i patent portfolio in 2014 likewise did not cause limitations to run on BlueRadios' legal malpractice claims. BlueRadios demanded that its tolling agreement with HBSR become effective December 5, 2017 (allowing BlueRadios to sue on any claims that did not accrue before the drop-dead date of December 5, 2014), specifically to ensure that nothing from Klobucar's inquiry would cause BlueRadios' claims to become time barred. BlueRadios' careful choice was entirely correct. Nothing that Klobucar learned *before* December 5, 2014 put him on notice of any problems with the Golden-i portfolio. And Klobucar did not transmit the results of his inquiry to anyone at BlueRadios who would have recognized issues with the portfolio until after that date. The district court misstated the facts and misinterpreted the law in concluding otherwise.

## ARGUMENT

## I. Standard of review

The district court's decision to grant summary judgment is reviewed "de novo, viewing the record in the light most favorable to the nonmovants and drawing all reasonable inferences in their favor." *Martinez v. Novo Nordisk Inc.*, 992 F.3d 12, 16 (1st Cir. 2021). To obtain summary judgment, HBSR had

28

to establish through "conclusive" evidence and "beyond peradventure" that BlueRadios' claims are time-barred. *Torres Vargas v. Santiago Cummings*, 149 F.3d 29, 35-36 (1st Cir. 1998). It did not do so.

## II. BlueRadios formed an attorney-client relationship with HBSR.

Perhaps the district court's most fundamental error is the one buried at the end of its opinion: its conclusion that BlueRadios never formed any attorney-client relationship with HBSR. *See* ADD27. Despite what the district court held, BlueRadios plainly presented summary-judgment evidence demonstrating that genuine issues of material fact existed on this question—indeed, the evidence establishing the existence of that relationship is conclusive.

### A. HBSR had to be in an attorney-client relationship with BlueRadios to prosecute patents on its behalf.

An attorney-client relationship exists as a matter of law because both HBSR and Kopin repeatedly and expressly recognized that they were in a joint attorney-client relationship with BlueRadios. Some of these representations were direct, such as when HBSR referred to itself was the "Attorney" for BlueRadios inventors in communications with the WIPO (A545, A827), and when Kopin, in communications with BlueRadios, referred to

HBSR as "our attorney[s]" and "our patent lawyers"—collectively (A4303, A4312).

HBSR also represented that it had a joint attorney-client relationship with BlueRadios *indirectly*, by filing patent applications on behalf of both Kopin and BlueRadios—and for the '177 Application, on behalf of *only* BlueRadios. "[W]here two parties are jointly prosecuting a patent application, they are commonly considered," by courts across the country, "to be joint clients" of the attorneys on the application. *Merck Eprova Ag v. ProThera, Inc.*, 670 F. Supp. 2d 201, 211 (S.D.N.Y. 2009).[5] That is the law in this circuit. *Mass. Eye & Ear Infirmary v. QLT Phototherapeutics, Inc.*, 412 F.3d 215, 226 (1st Cir. 2005) ("agree[ing]" with district court's holding that an attorney-client relationship was created when law firm filed patent application "on behalf of" putative client, 167 F. Supp. 2d 108, 119, 124-126, 127 (D. Mass. 2001)). That is the law in the Federal Circuit, the court with exclusive appellate

---

[5] *See also Naturalock Solutions, LLC v. Baxter Healthcare Corp.*, No. 14-cv-10113, 2016 WL 2958374, at *2 (N.D. Ill. May 22, 2016) ("Courts have long held that an attorney-client relationship exists among clients and attorneys allied in … prosecution of a patent."); *Loop AI Labs Inc. v. Gatti*, No. 15-cv-00798-HSG, 2016 WL 730211 (N.D. Cal. Feb. 24, 2016) (same); *Energy Creates Energy, LLC v. Brinks Gilson Lione, P.C.*, No. 4:18-cv-00913-DGK, 2020 WL 12702546 (W.D. Mo. Aug. 26, 2020) (same); *Beasley v. Avery Dennison Corp.*, No. SA-04-CA-0866, 2006 WL 2854396 (W.D. Tex. Oct. 4, 2006) (same); *Hillerich Bradsby Co. v. MacKay*, 26 F. Supp. 2d 124, 126 (D.D.C. 1998) (same).

jurisdiction over patent matters. *See In re Regents of the Univ. of Cal.*, 101 F.3d 1386, 1389-90 (Fed. Cir. 1996) (holding that joint representation arises from "common legal interest in developing patents") (internal quotation omitted). That is even the holding of the Colorado district court in the Kopin case, which held that when HBSR assisted BlueRadios and Kopin "by preparing, filing, and perfecting the parties' jointly held rights in patent applications," it "was acting as attorney for both parties." No. 1:16-cv-02052-JLK [Dkt. 379] at 7 (D. Colo. July 12, 2022).

Filing a patent application on behalf of a client *requires* the existence of an attorney-client relationship. "The preparation and prosecution of patent applications for others constitutes the practice of law," *Sperry v. Florida ex rel. Florida Bar*, 373 US 379, 383 (1963), and by federal regulation, a patent practitioner's signature on an application constitutes a representation that the practitioner "is authorized to represent the particular party on whose behalf he or she acts," 37 C.F.R. § 1.34, serving "exactly the same function as an appearance" in a lawsuit. *Wright v. Rinaldo*, 761 N.W.2d 114, 122 (Mich. App. 2008).

Under the unbroken line of authorities outlined above, every joint patent application that HBSR filed on BlueRadios' behalf demonstrates conclusively

that they were part of a joint attorney-client relationship. The '177 Application is particularly strong evidence of that relationship because it contains BlueRadios' solely owned technology and names *only* BlueRadios' employees as inventors. HBSR had no authority to file that application *at all* unless BlueRadios was its client.

The district court departed from this unbroken line of authorities, the representations of the parties in this case, and the explicit holding of the Colorado district court, based on a single case: *Sun Studs, Inc. v. Applied Theory Assocs.*, 772 F.2d 1557 (Fed. Cir. 1985). *See* ADD33. But *Sun Studs* has no bearing on this case.

*Sun Studs* involved a person who claimed to be a client of a law firm that filed a patent application for his employer *solely* by virtue of the fact that he executed a "power of attorney" empowering the law firm to deal with the USPTO on his behalf. 772 F.2d at 1564-1565, 1567-69. The court held that the execution of the power of attorney could not establish an attorney-client relationship "ipso facto," *id.* at 1568, and any suggestion that it *might* do so was negated by the fact that the would-be inventor had assigned all his substantive rights in the patent application to his employer and therefore had

no basis to assert any individual interest in the subject of the law firm's representation. *Id.* at 1567-69.

*Sun Studs* has no bearing here because BlueRadios never assigned *any* of its ownership rights in the patent applications to anyone else. To the contrary, BlueRadios expressly *retained* sole ownership of the intellectual property it brought into the Golden-i Project and obtained joint ownership of the intellectual property BlueRadios developed during the venture. A2549. Accordingly, no assignment exists that could bring this case within the unique facts of *Sun Studs*, and therefore nothing brings this case outside the rule adopted by courts nationwide holding that inclusion of joint applicants on a patent application equates to joint representation of both. The district court erred in concluding otherwise.

**B.    The evidence raises at least genuine issues of material fact on whether HBSR had an attorney-client relationship with BlueRadios.**

Even if HBSR's express attorney-client relationship with BlueRadios were not explicitly recognized by the parties and the district court in the Kopin litigation, it would be established by the summary-judgment evidence in this case.

While there was no express attorney-client engagement agreement between BlueRadios and HBSR, Massachusetts allows an attorney-client relationship to be created by implication. There is a three-part test in Massachusetts, first announced in *DeVaux v. Am. Home Assur. Co.*, 444 N.E.2d 355, 357 (Mass. 1983), for determining whether an implied attorney-client relationship exists:

> (1) a person seeks advice or assistance from an attorney,
>
> (2) the advice or assistance sought pertains to matters within the attorney's professional competence, and
>
> (3) the attorney expressly or impliedly agrees to give or actually gives the desired advice or assistance.

Under the *DeVaux* test, "the third element may be established by proof of detrimental reliance, when the person seeking legal services reasonably relies on the attorney to provide them and the attorney, aware of such reliance, does nothing to negate it." *Id.* at 357. Moreover, "[w]here reasonable persons could differ as to the existence of an attorney-client relationship, this issue must be resolved by the trier of fact." *Id.*

The *DeVaux* test is easily satisfied because there is no question that an attorney-client relationship exists in this case: Such a relationship existed between HBSR and Kopin. And at the very least, there are genuine issues of material fact about whether BlueRadios was part of that relationship. The

parties within the relationship all behaved toward BlueRadios as if it was included. BlueRadios sought specialized advice and assistance from HBSR attorneys on multiple occasions—with and without Kopin being present— which HBSR agreed to provide, including by filing one patent application (the '177) listing only BlueRadios employees. As part of those communications, BlueRadios shared deeply confidential information with HBSR, including its trade secrets, in reliance on the protections of the attorney-client relationship. *See supra* at 10. Moreover, as *Sun Studs* suggests, and this Court has confirmed, the fact that BlueRadios executed a power of attorney in favor of HBSR must "have some impact on our analysis of whether an implied attorney-client relationship was formed." *Int'l Strategies, Inc. v. Greenberg Traurig*, 482 F.3d 1, 8 (1st Cir. 2007). Accordingly, considering the evidence in the light most favorable to the nonmovant, whether BlueRadios enjoyed an attorney-client relationship with HBSR was at least a question of fact for the jury to decide.

The district court disregarded all of these facts demonstrating the existence of an attorney-client relationship, finding that the first "prong" of the *DeVaux* test was not met. The district court held that BlueRadios never made the "individualized" request for legal "advice or assistance" necessary

35

for an attorney-client relationship because it was Jacobsen at Kopin, rather than anyone at BlueRadios, who handled most of the communications with the law firm. ADD34.

The district court's conclusion conflicts directly with the summary-judgment evidence. It is undisputed that BlueRadios reached out to HBSR for individualized legal advice and assistance. It simply did so mostly *through Jacobsen*, the Golden-i leader at Kopin, which had the "responsibility" for obtaining any patents deemed necessary for the Golden-i Project, and engaging any attorneys necessary for doing so at its sole expense. That made Kopin an agent of BlueRadios in its dealings with HBSR—empowering Kopin to act as its "representative" on its "behalf"—"with power to affect" BlueRadios' "legal rights and duties." RESTATEMENT (THIRD) AGENCY § 1 cmt. c. As the Colorado district court recognized in the Kopin litigation, that meant Kopin's "selection and retention" of HBSR "was for the common undertaking of the parties"—"for the benefit of both itself and BlueRadios." A8767.

The district court in this case provided no reason for departing from that holding. BlueRadios' explicit requests for legal advice and assistance cannot be dismissed merely because, at certain times, it occurred through an

intermediary. That practice is common in joint ventures, in which "one representative will interact with the attorney on behalf of all the clients," because it is "unrealistic to expect that each client will necessarily execute a separate retainer agreement, communicate with counsel independently, or provide individual payment for services rendered." *Merck*, 670 F. Supp. 2d at 211. Instead, just as an attorney representing a "husband and wife" will understand that the attorney represents both spouses even when "one spouse establishes and effectuates the attorney-client relationship," so too will an attorney recognize that he represents both members of a joint venture when prosecuting patent applications on their behalf. *Id.*

The first prong of *DeVaux* does not, and should not, require otherwise. That prong is meant to ensure that an attorney-client relationship is based upon something more than the client's mere "subjective, unspoken belief that the person with whom he is dealing, who happens to be *a* lawyer, has become *his* lawyer." *Sheinkopf v. Stone*, 927 F.2d 1259, 1265 (1st Cir. 1991) (emphasis in original). It exists to distinguish cocktail conversations from legal engagements. *DeVaux* cannot require that each client in a joint engagement reach out separately to engage an attorney, which would put impracticable burdens on joint venturers. Nor can it prohibit people from engaging lawyers

37

through agents—a move that would prove problematic for any corporation seeking legal advice, as corporations can "only act through [their] agents." *Comm. v. L.A.L. Corp.*, 511 N.E.2d 599, 602 (Mass. 1987).

In any event, if individualized requests for legal advice or assistance directly from BlueRadios to HBSR were necessary, they certainly exist here. BlueRadios unquestionably sought HBSR's "assistance" in arranging for HBSR to file patent applications on its behalf—and its request for such assistance contained at least an "implied" request for legal advice. *Mass. Eye & Ear Infirmary v. QLT Phototherapeutics, Inc.,* 167 F. Supp. 2d 108, 117 (D. Mass. 2001). BlueRadios further requested HBSR's advice during discussions over the patent applications HBSR was filing on BlueRadios' behalf—including requests to perform "discrete tasks." ADD7; *see supra* at 11.

The district court's reasons for disregarding these explicit individualized requests for advice or assistance are again unavailing. The court criticized both the *number* and *kind* of BlueRadios' direct requests for legal advice and assistance to HBSR, explicitly recognizing only one request to pass muster under *DeVaux*: BlueRadios' request that HBSR broaden one patent application to include "a Wifi embodiment." ADD10. The district court acknowledged that BlueRadios made other requests as well, but dismissed

38

each as irrelevant, simply because those requests did not form the basis for BlueRadios' claims as "to do something BlueRadios now claims [the Law Firm] should have done." ADD10 n.7 (citing D.252, ¶ 28).

There is, however, no minimum number of requests for legal advice or assistance necessary to commence an attorney-client relationship. A request to respond to a single demand letter will suffice. *See Murphy v. Smith*, 579 N.E.2d 165, 168 (Mass. 1991) (holding that attorney-client relationship was formed based on attorney's assurance that a letter questioning valid title did "not present a cause for concern and that he would take care of it"). Nor must the requests for legal advice and assistance necessary to *establish* an attorney-client relationship be the same as those offered to demonstrate *violations* of the relationship. These are two totally different inquiries.

The district court further concluded that none of BlueRadios' individual requests for legal advice satisfied *DeVaux* because BlueRadios had "contracted its ability to determine what patents would be prosecuted to Kopin" under the Joint Venture Agreement. ADD35. While BlueRadios had tasked Kopin with deciding *what* to patent, that did not preclude BlueRadios from seeking legal advice or assistance in the course of pursuing patent

applications on the things Kopin did decide to patent—especially when the first application names only BlueRadios inventors.

Finally, the district court decided that BlueRadios' requests for individualized advice or assistance should be disregarded because BlueRadios was not "invoiced" for HBSR's services and "did not voice that it considered the law firm to be its counsel." ADD36-37. Yet the question of who pays for legal services has never been determinative of whether an attorney-client relationship exists; it is merely a "factor" to "consider." *Max-Planck-Gesellschaft Zur Foerderung der Wissenschaften E.V. v. Wolf Greenfield & Sacks, PC*, 736 F. Supp. 2d 353, 360 (D. Mass. 2010). It also matters little whether BlueRadios occasionally referred to HBSR as "Kopin's lawyers" simply because Kopin had a pre-exiting relationship with HBSR outside the Golden-i Project. ADD36-37. Kopin and HBSR themselves repeatedly stated that HBSR represented BlueRadios. *See supra* at 30-31. Those representations constitute far more than BlueRadios' mere "subjective belief" that a joint attorney-client relationship existed between BlueRadios, Kopin, and HBSR. *Scheinkopf*, 927 F.2d at 1265-66. They constitute recognition of that relationship's existence by *the other members* in that relationship, which unquestionably made BlueRadios' subjective belief in the existence of the

40

relationship "objectively reasonable." *Id.* at 1268. For all these reasons, BlueRadios presented at least a genuine issue of material fact on the existence of an attorney-client relationship between BlueRadios and HBSR.[6] Indeed, the facts are conclusive on the question.

The district court's decision granting summary judgment in HBSR's favor must therefore be reversed and BlueRadios' motion for summary judgment on the existence of an attorney-client relationship (A487) should be granted instead. *See Continental Grain Co. v. Puerto Rico Maritime Shipping Authority*, 972 F.2d 426 (1st Cir. 1992) (resolving appeal from order denying motion for summary judgment granted in tandem with cross-motion for summary judgment).

## III. BlueRadios' relationship with HBSR tolled limitations on all of BlueRadios' claims.

---

[6] The district court determined that there was an independent basis to conclude that Lawrence Cogswell had no "implied attorney-client relationship" with BlueRadios, beyond its reasons for concluding that no such relationship existed with others at HBSR, because Cogswell "never communicated with BlueRadios" and was not a "partner" during the events in question. ADD32 n.18. While Cogswell never communicated with BlueRadios directly, he nonetheless made misleading statements to Klobucar during the inquiry into the Golden-i patent portfolio that Klobucar undertook on BlueRadios' behalf, falsely indicating that inventorship on the applications was "correct" when it was not. *See* A6162. Cogswell therefore assumed HBSR's duties to BlueRadios, and became liable to the same extent as everyone else at HBSR, because he "personally participate[d]" in his employer's torts. A1852 (quoting *Instant Image Print Shop, Inc. v. Lavigne, Keating, Halstead, Inc.,* No. 97WAD005, 1998 WL 201424, at *2, (1998 Mass. App. Div. 74, Apr. 15, 1998)).

The existence of an attorney-client relationship between BlueRadios and HBSR tolled limitations on BlueRadios' claims against HBSR under the "continuing representation" doctrine, which tolls limitations on legal malpractice claims so long as "the attorney in question continues to represent the plaintiff's interests in the matter in question." *Murphy*, 579 N.E.2d at 167. The doctrine "recognizes that a person seeking professional assistance has a right to repose confidence in the professional's ability and good faith, and realistically cannot be expected to question and assess the techniques employed or the manner in which the services are rendered." *Id.* (quoting *Cantu v. St. Paul Cos.*, 514 N.E.2d 666, 669 (Mass. 1987)).

No one disputes that any attorney-client relationship between HBSR and BlueRadios would have *begun* before the operative events of this case. Yet the district court held that the continuing representation doctrine was inapplicable because it concluded that any attorney-client relationship between HBSR and BlueRadios *terminated* outside the limitations period.

That was wrong. While the district court emphasized that BlueRadios had no direct communications with HBSR after 2009 (ADD28), it acknowledged that HBSR never notified BlueRadios that it was terminating its representation; indeed, HBSR was still prosecuting patent applications

42

naming BlueRadios inventors as late as August 2015 (when the '462 Application finally issued), and it was still prosecuting patents containing BlueRadios' developments *through 2024*, and Kopin was communicating with HBSR on BlueRadios' behalf throughout that time pursuant to its "responsibilities" under the Joint Venture Agreement. A1764. These events occurred well after December 5, 2014, and involved far more than mere "ministerial" actions. ADD28 (citing *Spatorico v. Egan, Flanagan & Cohen, P.C.*, No. 19-cv-30090-KAR, 2022 WL 4586465, at *10 (D. Mass. Sept. 29, 2022)).

They were instead more representations, made pursuant to federal regulation, that HBSR's attorney-client relationship with BlueRadios continued, presenting evidence from which reasonable jurors could conclude that BlueRadios continued to enjoy the benefit of the "continuing representation" doctrine long past the December 5, 2014 deadline by which its claims must accrue.

Yet even if that attorney-client relationship never existed, limitations would have still been tolled on BlueRadios' claims as the result of HBSR's fraudulent concealment of its harmful conduct. "Where a fiduciary relationship exists, the failure adequately to disclose the facts that would give

43

rise to knowledge of a cause of action constitutes fraudulent conduct" tolling limitations under Mass. Gen. Laws. ch. 260 § 12. *Demoulas v. Demoulas Super Markets, Inc.*, 677 N.E.2d 159, 174 (1997).

Such a fiduciary relationship exists here for multiple reasons. Even if Appellees were not BlueRadios' attorneys, they would remain BlueRadios' *agents*—as the result of the multiple powers of attorney BlueRadios executed in HBSR's favor. That agency relationship imposed a duty on HBSR "to make full disclosure to the principal of all material facts relevant to the agency" relationship. *Gagnon v. Coombs*, 654 N.E.2d 54, 62 (Mass. App. Ct. 1995). Furthermore, even if Appellees were not BlueRadios' lawyers, they remained *lawyers*, and lawyers owe duties to nonclients "who the attorney knows will rely on the services rendered," *Robertson v. Gaston Snow & Ely Bartlett*, 536 N.E.2d 344, 350 (Mass. 1989), (ii) "for the knowing or negligent provision of false information," *Nova Assignments, Inc. v. Kunian*, 928 N.E.2d 364, 368 (Mass. App. Ct. 2010) and (iii) when the lawyer "is acting for the benefit of both the client and the non-client." *Cheswell, Inc. v. Premier Homes and Land Corp.*, 319 F. Supp. 2d 144, 151 (D. Mass. 2004) (collecting cases). The existence of that duty prohibited HBSR's active efforts to conceal its misconduct, and those efforts provided an independent reason, separate from the continuing

representation doctrine, why limitations should have been tolled in this case. The district court once again erred in concluding otherwise.

## IV.    BlueRadios' claims are timely under the discovery rule.

The district court likewise erred in concluding that limitations expired on BlueRadios' claims under the discovery rule because BlueRadios did not acquire actual knowledge that it might have suffered legally cognizable harm as the result of HBSR's misconduct until 2017, well within the limitations period. Nothing that occurred before that time should suffice to trigger limitations.

### A.    BlueRadios did not learn the facts necessary to trigger limitations until 2017, when it uncovered the plot between Kopin and HBSR to deprive BlueRadios of its ownership rights in the Golden-i intellectual property.

Under Massachusetts' discovery rule, a legal malpractice cause of action cannot accrue, and the period of limitation does not begin to run, until the "client … knows or reasonably should know that he has sustained appreciable harm as a result of the lawyer's conduct." ADD17 (citing *Williams v. Ely*, 668 N.E.2d 799 (Mass. 1996)). Accordingly, three events must occur to trigger limitations in a malpractice case. *First*, the client must incur harm as the result of an attorney's misconduct. *Second*, the client must learn of the harm. *Third*, the client must recognize the "causal[] connect[ion]" between the harm and the

45

attorney's misconduct. *See Int'l Mobiles Corp. v. Curron & Black/Fairfield & Ellis, Inc*., 560 N.E.2d 122, 124 (Mass. App. Ct. 1990). "In most instances, the question when a plaintiff knew or should have known of its cause of action is one of fact that will be decided by the trier of fact." *Taygeta Corp. v. Varian Assocs., Inc.,* 763 N.E.2d 1053, 1063 (Mass. 2002). Only when "the facts regarding discovery of harm are undisputed" is summary judgment appropriate, because only a jury can resolve the credibility of a plaintiff's contention that she did not receive notice, or the reasonableness of her failure to obtain notice. *Mass. Housing Opportunities Corp. v. Whitman & Bingham Assocs., P.C.*, 983 N.E.2d 734, 737 (Mass. 2013). In this case, the questions of whether and when BlueRadios received actual notice of its claims against HBSR are hotly disputed, which alone made summary judgment inappropriate.

Even if that barrier against summary judgment could be set aside, however, the evidence establishes that alignment of the three stars necessary to trigger limitations did not occur until 2017—after HBSR appeared to defend Kopin in the Colorado litigation and during discovery in that litigation. Only then did Mark Kramer at BlueRadios learn that HBSR bore responsibility for the issues he discovered with the Golden-i patent portfolio (a

46

discovery that itself occurred after the December 5, 2014 drop-dead date for BlueRadios' claims). ADD24(citing A2156); A1769 (citing Dkt.234-34), A8173-74. Accordingly, limitations did not actually accrue on BlueRadios' malpractice claims against HBSR until 2017.

There is no evidence, much less conclusive evidence, from which a reasonable jury could conclude that BlueRadios received limitations-triggering notice at any earlier point.

### B. Misstating inventorship in a patent application cannot constitute the harm necessary for limitations to accrue.

The district court concluded that BlueRadios first became aware of HBSR's malpractice in 2008-2009, when HBSR amended the Golden-i patent applications to diminish BlueRadios' inventorship rights. ADD17-23. But there are a number of reasons why this determination is incorrect.

First, the events in the 2008-2009 timeframe concerned patent *applications*, not patents, and misstatements of inventorship in patent applications cannot cause any limitations-triggering injury. A1823. Unlike a patent, a patent application creates no rights of its own. An inventor does not acquire the rights of a patent holder until the patent application is granted and the patent itself issues. So "the owner or licensee of patent rights or applications may not bring an action until after the patent issues." David M.

Epstein, *Eckstro's Licensing in Foreign and Domestic Operations* § 4:2 (2021). Indeed, the Colorado district court refused BlueRadios' request to prohibit HBSR from continuing to prosecute patent applications containing its inventions precisely because federal district courts are authorized only to "resolve inventorship disputes over issued patents," and "where the inventorship of a patent is at issue, only the USPTO can grant relief." *See BlueRadios, Inc. v. Kopin Corp.*, No. 1:16-cv-02052-JLK [Dkt. 112] at 9 (D. Colo. June 20, 2018) (internal quotations omitted). That prevents limitations from running on any claim related to inventorship on a patent application, because "[a] cause of action cannot be barred … before it accrues; it is never extinct when it comes into existence." *Hor v. Chu*, 699 F.3d 1331, 1335 (Fed. Cir. 2012) (internal quotation omitted). Moreover, as the events of this case demonstrate, so long as a patent application remains an application, it can be (and commonly is) amended by the USPTO to correct inventorship problems. *See* 37 C.F.R. § 1.112 (describing the process for amending a patent). Accordingly, misstating inventorship in a patent application has no immediate effect on an inventor's rights.

Furthermore, many of the patent applications at issue here do not even involve "regular" patent applications, they involve *provisional* patent

applications, which never ripen into patent rights, and merely serve as "placeholders" granting "the applicant 'the benefit of priority' for an invention." *United States v. Camick*, 796 F.3d 1206, 1218 (10th Cir. 2015) (*quoting MPEP* § 201.04).

For these reasons, courts around the country, including the Federal Circuit, have held that problems in patent applications cause no limitations-triggering injury—only issuance of the patent itself may do so. *Stark v. Advanced Magnetics, Inc.*, 29 F.3d 1570, 1576 (Fed. Cir. 1994) (claims for correction of inventorship on patents do not accrue until "each patent issues") (concerning laches); *Gilead Servs., Inc. v. United States*, 151 Fed. Cl. 742, 748 (2020) (holding filing of provisional patent application does not establish damages to trigger statute of limitations; the issuance of a patent does); *Javo Beverage Co. v. California Extraction Ventures, Inc.*, 19-Civ-1859, 2019 WL 6467802, at *3 (S.D. Cal. Dec. 2, 2019) ("[T]he Court cannot conclude, as a matter of law, that [plaintiff's] claims accrued … due to the publication of the patent application itself."); *Pro Marketing Sales, Inc. v. Secturion Sys., Inc.* No. 1:19-cv-00113, 2021 WL 1987192 (D. Utah May 17, 2021) ("[I]t would not be appropriate for the provisional application dates to serve as the dates of accrual."). This rule can prevent limitations from commencing in cases

involving patent applications for substantial amounts of time—because it will often take several years for the patent application to become an issued patent.

Furthermore, these cases involving patent applications are actually *less* protective of plaintiffs suing for problems in patent applications than Massachusetts, because Massachusetts follows the rule that even final issuance of a defective document drafted by a lawyer does not cause injury sufficient to trigger limitations on a malpractice claim, and no such injury occurs until the defective document is *enforced* to the plaintiff's detriment. *See Eck v. Kellem*, 51 Mass. App. Ct. 850, 855-56 (2001) (client suffered no "cognizable harm" when attorney drafted defective sale agreement that failed to protect client from environmental liability; harm occurred only after "outcome" of lawsuit establishing environmental liability); *Spilios v. Cohen*, 38 Mass. App. Ct. 338, 339-40 (1995) (holding that since it was only possible to determine whether there was legal malpractice after a verdict on the underlying dispute was rendered, the statute of limitations did not begin to run until that time). Under this rule, the patent applications at issue in this case are equally incapable of causing BlueRadios' claims to be time-barred.

The district court recognized these cases suggesting that mere problems in patent applications are "incapable of producing harm" sufficient to trigger

50

limitations, and it distinguished one such case, *Gilead*, based on its procedural context. ADD19 n.13. But the rule stated in *Gilead* is universal: claims relating to asserted errors in patent applications do not accrue until "the date of [the] first patent issuance" or the "the date when" the patent is improperly "asserted." 151 Fed. Cl. at 748. That is true regardless of whether the harm at issue in the case involves "risk of patent infringement damages" (ADD19 n.13) or merely requests correction of the patent itself. *See, e.g.*, *Stark*, 29 F.3d at 1576. The district court in this case therefore stands alone in holding that errors in a patent application are capable of triggering limitations in *any* context.

The district court's reasons for disregarding the injury-free nature of *provisional* patent applications are equally misguided. ADDn.13. While the court recognized that provisionals themselves are "incapable of producing harm," it found harm nonetheless because provisionals can be used to establish priority for *other* "related patent applications." *Id*. Perhaps true, but that merely pushes the timeline by which harm from a provisional could occur even further—past the point that patents based on those provisionals actually issue and those patents are enforced. Accordingly, neither of the rationales offered

by the district court serve to overcome the fact that patent applications cause no immediate limitations-triggering harm.

### C. Nothing that BlueRadios learned in the 2008-2009 timeframe gave it notice of any injury or HBSR's malpractice.

Putting aside that patent applications—especially provisionals—are not capable of causing limitations to accrue on attorney malpractice claims, BlueRadios did not learn anything about any issues with the Golden-i patent applications in the 2008-2009 timeframe that would suffice to trigger limitations. The district court erred in concluding otherwise.

#### 1. HBSR's undisclosed amendments to, and abandonment of, the parties' joint patent applications did not give BlueRadios notice of HBSR's malfeasance.

There are several reasons why the applications that HBSR filed on BlueRadios' behalf in the 2008-2009 timeframe were insufficient to convey notice. Foremost among these is that HBSR did its best to keep BlueRadios in the dark about its attempts to disadvantage BlueRadios' interests by amending the '462 and '646 Applications, filing terminal disclaimers on some applications, and completely abandoning others—in violation of its duty to keep its client informed about its legal representation (*see, e.g.*, Mass. Rule Prof. Conduct 1.4). These surreptitious changes, kept hidden from BlueRadios, obviously did not give BlueRadios actual notice of anything.

The district court nonetheless concluded that BlueRadios obtained "constructive notice" of the secret changes to the applications, and the plot to deprive BlueRadios of its interest in the Golden-i intellectual property, because the applications were "publicly available" on the USPTO website. ADD22 (citing *Wise v. Hubbard*, 769 F.2d 1,2-3 (1st Cir. 1985)).

Critically, however, Massachusetts maintains no doctrine of "constructive notice" that deems a person to have obtained limitations-triggering notice of a claim merely because that person *might* have been able to discover its existence by consulting public records. While some older Massachusetts decisions indicated that an injury must be "inherently unknowable" for the discovery rule to apply, thereby seeming to incorporate notions of constructive notice, *see Williams*, 668 N.E.2d at 804 n.7 (collecting cases), the Massachusetts Supreme Judicial Court has since clarified that the "inherently undiscoverable" standard "is no different from, and is used interchangeably with, the 'knew or should have known' standard." *Davalos v. Bay Watch, Inc.*, No. SJC-13534, 2024 WL 4031129, at *4 (Mass. Sept. 4, 2024). Accordingly, in Massachusetts, there is no "threshold inquiry, asking whether the cause of action is, in some categorical fashion, 'inherently unknowable.'" *Id.* It was therefore completely incorrect for the district court to conclude that

BlueRadios received limitations-triggering "constructive notice" of the plot between HBSR and Kopin to deprive it of its intellectual property interests.

### 2. The patent applications BlueRadios received did not, and could not, convey limitations-triggering notice.

The court also emphasized that BlueRadios actually received certain copies of applications that would later form the basis for BlueRadios' claims against HBSR. These included U.S. Non-Provisional Patent Application 12/348,627 (the "'**627 Application**"), in which HBSR misstated inventorship—swapping Jones, a BlueRadios employee, for Jacobsen, a Kopin employee—even though the technology covered by the application was invented by BlueRadios, and Jacobsen himself questioned whether he should be listed as inventor. A6375. These applications also included the original '462 and '646 Applications, which BlueRadios received before they were amended to strip BlueRadios employees off the applications. ADD9, ADD11. The latter listed Kopin as sole "assignee" even though the BlueRadios inventors on those applications had assigned their rights to BlueRadios, and BlueRadios had not assigned its rights to anyone. A526, A549.

The district court apparently assumed that BlueRadios' mere receipt of these documents put it on notice of any issues they contained (and the source

of those issues) as a matter of law. That conclusion is both legally and factually flawed.

Even if a patent application containing attorney-generated errors was capable of causing a limitations-triggering injury, Massachusetts maintains no rule suggesting that mere receipt of such a document so conclusively conveys actual notice of such injury or its source as to justify summary judgment on limitations grounds. On the contrary, several cases refute the idea. For instance, it was not the defectively prepared "sale agreement" itself in *Eck* that put the client on notice of harm arising from his attorney's malpractice in preparing the document—even though the client signed and presumably read the document. Instead, in *Eck*, only a court judgment declaring that the contract failed to provide protections the client had requested actually provided notice. 51 Mass. App. Ct. at 853-56. Nor was the defective "Fill Agreement" at issue in this Court's decision in *Rosen Constr. Ventures, Inc. v. Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.*, 364 F.3d 399, 402, 407 (1st Cir. 2004) sufficient to convey actual notice—that too required a "judgment" to do so.

The results in these cases make complete sense. Mere receipt of a document that has been prepared improperly by an attorney cannot establish

notice of the existence of malpractice or its source because errors associated with attorney malpractice are unlikely to jump off the page. After all, clients necessarily reposit trust in the professionals they hire, making them unlikely to view their counsel's acts with skepticism, and inexpert at identifying shoddy legal work: "[T]he client is not an expert; he cannot be expected to recognize professional negligence if he sees it." *Hendrickson*, 310 N.E.2d at 135. Accordingly, clients usually *cannot* identify attorney malpractice even when it happens right before their eyes. It usually takes someone with *specialized legal experience* to point out the error to them. *See Williams*, 668 N.E.2d at 805 423 (rejecting argument that professional fiduciary should have known implications of gift tax decision, as it posed "questions to which a lawyer, but not a lay person, might have known the answers"). This is exactly why attorneys have a duty to disclose their failures to clients.

In suggesting that the law is otherwise, and mere receipt of a document constitutes sufficient notice of attorney-created problems with its contents to trigger limitations on a malpractice claim as a matter of law, the district court turned once again to discredited concepts of "constructive notice." The district court noted that in *Geo. Knight & Co. v. Watson Wyatt & Co.*, 170 F.3d 210, 214 (1st Cir. 1999), this Court held that mere receipt of "forms filed annually

56

on behalf of the plaintiff" were sufficient to trigger limitations. ADD19 n.13. But that case actually turned on whether the error was "inherently unknowable," 170 F.3d at 213, and therefore no longer reflects applicable Massachusetts law. Simply stated, there is no authority—none—suggesting that mere receipt of a single document containing attorney-generated errors gives the recipient actual notice of malpractice contained within it, much less that such receipt establishes notice as a matter of law.

Yet even if it were possible *in some cases* to infer actual notice of attorney malpractice from mere receipt of a document containing attorney-created errors, this case is not one of them. The errors on the patent applications at issue here concern inventorship, "one of the muddiest concepts in the muddy metaphysics of the patent law," *Mueller Brass Co. v. Reading Indus., Inc.*, 352 F. Supp. 1357, 1372 (E.D. Pa. 1972), turning on arcana that laypeople cannot hope to understand, and claim language so inscrutable that its interpretation cannot be trusted to regular attorneys—one of many reasons why patent prosecution is a specialized practice, requiring a special license to pursue. Problems regarding inventorship therefore usually cannot be uncovered by mere lay people.

BlueRadios was particularly ill-suited to uncover any problems regarding inventorship in the patent applications they obtained. As a small, 3-person company owned exclusively by engineers with almost no knowledge of the patent prosecution process that had never attempted to patent anything, BlueRadios employees did not know what a patent claim was, how inventorship was determined, what the designation of an "assignee" on a patent actually meant, or why it would be necessary to list it on a patent application. A6367-68, A6369, A6370 (citing Dkt.234-3, 6, 34, 35), A8171-72, A81348-49.

Accordingly, if HBSR acted improperly in listing Jacobsen on the '627 Application instead of Jones, and incorrectly listed Kopin as the sole assignee on the '462 and '646 Applications when it was not, BlueRadios was incapable of uncovering those errors on its own. Indeed, BlueRadios did not even learn that Jacobsen had been swapped for Jones until discovery in the Colorado litigation in 2017, which produced notes indicating that Jacobsen had ██████████████ ████████████████████████████████ A6375 (citing Dkt.234-52, Dkt.234-34) (emphasis added); A8172, A8181. It would take the involvement of another attorney and patent practitioner—years later—to help BlueRadios uncover the issues with the assignments.

3.     **The issue with the '090 Provisional Patent Application did not put BlueRadios on notice of HBSR's malpractice.**

The district court nonetheless deemed it "unpersuasive" for BlueRadios to contend that it was incapable of identifying inventorship issues on the applications it received, or uncovering the secret plot between Kopin and HBSR, because BlueRadios was able to point out one potential issue with the inventorship on the '090 Provisional Application. ADD18-19. But there are numerous reasons why BlueRadios' ability to uncover that single issue could not possibly suggest that it would uncover inventorship problems on other applications—much less attribute those problems to HBSR's malpractice.

For one thing, the '090 was not merely a patent application, but a *provisional* patent application, making it incapable of causing any limitations-triggering injury. For another, BlueRadios thought that the sole error it identified in the '090 Provisional Application had been properly addressed. As the district court recognized, Kramer from BlueRadios emailed BlueRadios co-founder Tucker flagging that the '090 Provisional Application listed no BlueRadios inventors while seemingly containing BlueRadios technology and wondered whether this might be "sort of reckless;" Tucker then asked

whether HBSR should be notified of the issue. ADD9; *See* ADD8-9 (citing

A8408-09), ADD18; A6371, A5453, A7448-49, A8936.

Tucker then *did* notify HBSR—through Kopin. While Tucker did not

send HBSR any "formal letter" (ADD.9), he forwarded Kramer's email to

Jacobsen asking whether Sample should be added as an inventor to the '090

Provisional Application, and then Jacobsen emailed Kazanjian at HBSR about

the issue, copying Tucker. (ADD8-9). At that point, Tucker believed the issue

would be properly addressed by HBSR, because at that point, BlueRadios had

no reason to distrust either Jacobsen, Kopin, or HBSR. Any "misgivings"

BlueRadios might have possessed had been assuaged by assurances from

Kopin.[7] (ADD18). In any event, mere "misgivings" and "suspicion" are "poles

apart on a continuum of understanding" from the actual knowledge necessary

---

[7] Both Kopin and HBSR also gave BlueRadios numerous assurances that they wanted to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (A6390, A8418), that Sample "should be added as an inventor to the '090" application (ADD9, citing Dkt.247-1) and that ▮▮▮▮▮▮▮▮▮▮▮▮▮ were named on each of the pending patent applications and issued patents at issue." A6377-78 (citing Dkt.234-26, Dkt.234-57). Those assurances kept BlueRadios from obtaining "notice of appreciable harm" (ADD25 n.15), and kept limitations from running regardless of whether HBSR represented it or not. *Eck*, 51 Mass. App. Ct. at 855 (noting that case came "close to" the continuing representation doctrine where attorney made representations to non-client that he "was not exposed to liability"). The district court could only disregard those assurances by pretending they never occurred. ADD25 n.15.

to trigger limitations as a matter of law. *Mass. Eye & Ear*, 412 F.3d at 230 (internal quotations omitted).

In any event, this single supposed error on one isolated provisional application that Kopin and HBSR seemed happy to address did not provide any grounds for BlueRadios to question whether Kopin and HBSR were engaged in a plot to make secret amendments to or abandon other applications. Pointing out one potential issue with an attorney's work cannot permanently bar the client from challenging other issues with that work. Furthermore, BlueRadios' identification of this single, fairly obvious error did not conclusively demonstrate BlueRadios to be an expert on all things related to patents, inventorship, or assignments—especially when BlueRadios founders specifically disclaimed such expertise. The district court concluded otherwise only by deeming BlueRadios' contentions "unpersuasive" (ADD19), thereby inserting *its own* opinion on the credibility of these witnesses' testimony—a plain violation of summary judgment standards. For all these reasons, the questions of whether the issues with the '090 Provisional Application, or the issues on any other patents applications, put BlueRadios on notice of malpractice by HBSR or the plot between the law firm and Kopin,

were for the fact-finder to resolve. The district court once again erred in concluding otherwise.

### D. Nothing that occurred during Klobucar's 2014 limited search of the Golden-i patent portfolio gave BlueRadios limitation-triggering notice.

The district court also concluded that BlueRadios acquired notice sufficient to trigger limitations in 2014 when it hired Klobucar to search for patent records related to the Golden-i Project. ADD13-14, ADD23-27. Yet nothing that occurred during Klobucar's search trigged limitations prior to December 5, 2014, and the district court misstated the law, misapplied the undisputed facts, and failed to read the evidence in the light most favorable to BlueRadios in concluding otherwise.

In 2014, BlueRadios still had not suffered any injury regarding any of the applications that HBSR had filed. The '646 did not even become a patent until 2015. *See* ADD9-10. Furthermore, while legal expenses incurred to "ameliorate the harm" caused by an attorney's malpractice can constitute a limitations-triggering injury, such fees do not do so when expended for another purpose. *Rosen Const.*, 364 F.3d at 405 (internal quotation omitted). Klobucar was not hired to *fix* problems with the applications HBSR had prepared. A8173. He was hired simply to identify the patents and applications

related to the Golden-i patent portfolio. ADD.21; A6510, A6376, Dkt.234-24, ¶4.

There are also several reasons why nothing Klobucar learned during that search constituted limitations-triggering notice. First, when Klobucar conducted his inquiry into the Golden-i patent portfolio on November 26, 2014, and compiled a list of one patent and two patent applications related to the Golden-i Project as part of that search, he did not evaluate the patent for correctness, and had no prior knowledge that would give him reason to believe the portfolio contained any problems. ADD14, 23 (citing A4099-103); Dkt.234-24, ¶8), A8173. Second, when Klobucar reviewed the applications' "prosecution history," he learned only that changes had been made—but did not know enough to understand that the changes were bad, that they resulted from attorney malpractice, or that they had been kept secret from BlueRadios. ADD14. Third, Klobucar did not communicate the results of his inquiry to anyone at BlueRadios who understood the history of the Golden-i Project and *might* have been able to connect those dots until "mid-December 2014"—within the limitations period. ADD24 (citing A2460).

Of course, the evidence suggests that Klobucar did learn at some point of certain issues with the patent applications. He sent two demand letters to

63

HBSR (and billed to the file for doing so)—in January and May 2015—noting "inconsistencies in the patent applications" and the "troubling" fact that one patent application improperly listed Kopin as assignee. ADD14. These letters were sent *after* December 4, 2014—and thus occurred within the limitations period. Accordingly, there was a fatal evidentiary mismatch between the information that Klobucar learned *outside* the limitations period, which could not trigger limitations, and the information he transmitted to others inside BlueRadios that might have triggered limitations, which was received *inside* the limitations period.

The district court tried various means to evade this fatal evidentiary mismatch, but none are effective. The court first suggested that Klobucar and BlueRadios had already identified problems with the Golden-i portfolio *before* Klobucar started his search. The court concluded that before tasking Klobucar with that inquiry, Kramer had *already made* the discovery that BlueRadios "couldn't find our names on patents that we were claimed to be put on from Kopin and our patent attorney HBSR." ADD24 (citing Dkt.247-1 ¶42); A2156-57. That conclusion cannot be squared with the very deposition testimony that the court cites to support it. In that testimony, Kramer stated:

> One of the clients wanted to know what our patent portfolio is. We were searching and we couldn't find our names on patents that we

64

were claimed to be put on from Kopin and our patent attorney HBSR.

So we had our -- at that time we had a patent person in New Jersey [Klobucar] doing some IOT stuff. I said, hey, I can't search in the USPTO. I'm not that efficient. Can you go find the history of what happened to these patents?

A2156-57. From this single snippet of transcript, the district court concluded that Kramer's discovery about the problems with the Golden-i patent portfolio came *before* tasking Klobucar to look into the patent portfolio in November 14, simply because Kramer's request that Klobucar "go find the history of what happened to these patents" follows Kramer's discovery about those patents on the page. Yet when Kramer's testimony is considered in context, it is apparent that, in the passage following Kramer's description of his discovery, he was merely explaining the context of that discovery—that it happened *after* Kramer had asked Klobucar to look into the "history" of the patents as part of the acquisition. After all, how could Kramer have *already* discovered that BlueRadios' name was missing from patents if he had no ability to "search" for patents "in the USPTO" on his own?

Accordingly, this passage contains no evidence that Klobucar, Kramer, or anyone else at BlueRadios learned of any issues with the Golden-i patent portfolio outside the limitations period—and certainly cannot constitute *conclusive* evidence of those things. And BlueRadios' right to recover more

65

than $100 million in damages should not hang on any imprecision in Kramer's remarks.

Perhaps sensing the weakness in its reading of the evidence, the district court tried another, even weaker theory to overcome the mismatch between the information Klobucar learned outside the limitations period and the information it transmitted to BlueRadios inside that period. The court noted the black-letter principle that an "agent's" knowledge is attributable to its "principal," thereby concluding that Klobucar's knowledge could be *combined* with the knowledge of BlueRadios employees to trigger limitations even though *no single person* within the company possessed all the requisite knowledge to satisfy the discovery rule. ADD25.

This theory contains numerous fatal flaws. First, mere collective "knowledge" is insufficient to trigger limitations. "Awareness" is required. *Doe v. Creighton*, 439 Mass. 281, 283 (2003). While a corporation might collectively possess the sum total of its employees' "knowledge," "awareness" is something that only some individual *within* the corporation can possess. For the discovery rule to be satisfied, one single individual within the organization must have understood that the company was injured, and that the injury

resulted from an attorney's misconduct. That individual does not exist in this case.

There is an even deeper problem with the district court's "collective corporate consciousness" theory of notice: Even if BlueRadios employees had learned of issues with certain patent applications outside the limitations period, there is no reason to conclude that they would have necessarily attributed the issues to their lawyers rather than their venture partners.

For all these reasons, genuine issues of material fact existed on whether limitations on BlueRadios' attorney malpractice claims was triggered outside the limitations period. Summary judgment should not have been granted.

## CONCLUSION

The Court should reverse the summary judgment in HSBR's favor, grant BlueRadios' motion for summary judgment on the attorney-client relationship, and remand the case for trial.

Respectfully submitted,

*J. Carl Cecere*

David B. Seserman
Seserman Law LLC
3900 E. Mexico Ave.
Suite 300
Denver, CO 80210
(303) 900-2406

Douglas W. Salvesen
Sanford F. Rems
Yurko Partners, P.C.
One Tech Drive
Suite 205
Andover, MA 01810

J. Carl Cecere
CECERE PC
6035 McCommas Blvd.
Dallas, Texas  75206
(469) 600-9455
ccecere@cecerepc.com

## CERTIFICATE OF COMPLIANCE

*Certificate of Compliance with Type-Volume Limitation,*
*Typeface Requirements, and Type Style Requirements*

1.     This brief complies with the type-volume limits in Federal Rule of Appellate Procedure 32(a)(1) because this brief contains 13,000 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2013 in 14-point Century Expanded BT font.

March 20, 2025                                  */s/ J. Carl Cecere*

                                                J. Carl Cecere

                                                Attorney for Appellant

                                                Cecere PC
                                                6035 McCommas Blvd.
                                                Dallas, TX  75206
                                                ccecere@cecerepc.com
                                                tel: 469.600.9455

## CERTIFICATE OF SERVICE

I hereby certify that on March 20, 2025, I electronically filed the Final Form Brief for BlueRadios, Inc. with the Clerk of the Court for the United States Court of Appeals for the First Circuit using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF.

March 20, 2025                          */s/ J. Carl Cecere*

                                        J. Carl Cecere

                                        Attorney for Plaintiff-Appellant

ADDENDUM

## ADDENDUM TABLE OF CONTENTS

                                                          **Page**

Memorandum and Order (09/18/2024 ECF No. 268) ................................ ADD1

Judgment (09/18/2024 ECF No. 269)......................................................... ADD38

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| BLUERADIOS, INC., | ) |
|  | ) |
| Plaintiff, | ) |
|  | ) |
| v. | ) |
|  | ) Case No. 21-cv-10488-DJC |
| HAMILTON, BROOK, SMITH & REYNOLDS, P.C., et al., | ) |
|  | ) |
| Defendants. | ) |

## MEMORANDUM AND ORDER

**CASPER, J.**                                                            **September 18, 2024**

## I.    Introduction

Plaintiff BlueRadios, Inc., ("BlueRadios") has filed this lawsuit against Defendants Hamilton, Brook, Smith & Reynolds, P.C. (the "Law Firm"), David J. Thibodeau, Jr. ("Thibodeau"), Lawrence P. Cogswell III ("Cogswell"), Gerald Kazanjian ("Kazanjian"), David E. Brook ("Brook"), Joshua Matloff ("Matloff") and Nelson Scott Pierce ("Pierce") (collectively, "Defendants") alleging legal malpractice (Count I), breach of fiduciary duty (Count II), aiding and abetting breach of fiduciary duty (Count III), fraudulent nondisclosure or fraudulent concealment (Count IV), aiding and abetting fraudulent concealment (Count V) and a violation of Mass Gen. L. c. 93A ("Chapter 93A") (Count VII) in relation to patent prosecution of a headset called Golden-

i.  D. 47.[1]  Defendants have moved for summary judgment as to all claims.  D. 209.  BlueRadios

has moved for partial summary judgment on the issue of whether an attorney-client relationship

existed between Defendants and BlueRadios, D. 208, and on the issue of whether BlueRadios

could terminate a contract relating to development of the Golden-i headset with Kopin Corporation

("Kopin"), D. 204.  For the reasons stated below, the Court ALLOWS Defendants' motion for

summary judgment, D. 209, and DENIES BlueRadios's motions for partial summary judgment,

D. 204, 208.

## II.    Standard of Review

The Court grants summary judgment where there is no genuine dispute as to any material

fact and the undisputed facts demonstrate that the moving party is entitled to judgment as a matter

of law.  Fed. R. Civ. P. 56(a).  "A fact is material if it carries with it the potential to affect the

outcome of the suit under applicable law."  Santiago–Ramos v. Centennial P.R. Wireless Corp.,

217 F.3d 46, 52 (1st Cir. 2000) (citation omitted).  The movant "bears the burden of demonstrating

the absence of a genuine issue of material fact."  Carmona v. Toledo, 215 F.3d 124, 132 (1st Cir.

2000); see Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986).  If the movant meets its burden,

the non-moving party may not rest on the allegations or denials in its pleadings, Anderson v.

Liberty Lobby, Inc., 477 U.S. 242, 249 (1986), but must come forward with specific admissible

facts showing that there is a genuine issue for trial.  See Borges ex rel. S.M.B.W. v. Serrano–Isern,

605 F.3d 1, 5 (1st Cir. 2010). The Court "view[s] the record in the light most favorable to the

nonmovant, drawing reasonable inferences in his favor."  Noonan v. Staples, Inc., 556 F.3d 20, 25

(1st Cir. 2009).  "When deciding cross-motions for summary judgment, the court must consider

---

[1] The Court previously dismissed Counts I and II against Matloff and dismissed Count VI,
the civil conspiracy claim, against all Defendants.  D. 69.

each motion separately, drawing inferences against each movant in turn." Reich v. John Alden
Life Ins. Co., 126 F.3d 1, 6 (1st Cir. 1997) (citation omitted).

## III.    Factual Background

The Court draws the following facts from the parties' statements of undisputed facts,
responses to the same and accompanying exhibits.

### A.    BlueRadios Contracts with Kopin to Develop Golden-i

BlueRadios is a Colorado corporation that develops wireless technology. D. 247-1 ¶ 11.[2]
Mark Kramer ("Kramer") is the President and Chief Executive Officer of BlueRadios. D. 227-1 ¶
2; D. 247-1 ¶ 12. Wilfred Tucker ("Tucker") is the co-founder of BlueRadios and Chief
Technology Officer. D. 227-1 ¶ 2; D. 247-1 ¶ 27. Randy Jones ("Jones") was a co-founder and
software architect at BlueRadios and John Sample ("Sample") was one of BlueRadios's engineers.
D. 227-1 ¶ 2. On July 28, 2008, BlueRadios hired Christoper Parkinson ("Parkinson") who worked
on software development for Golden-i and who was an employee until mid-2009.
D. 252 ¶¶ 38, 41, 43; D. 247-1 ¶ 53. Parkinson assigned his intellectual property rights to
BlueRadios. D. 247-1 ¶ 52. BlueRadios did not tell the Law Firm that it had entered into an
agreement with Parkinson or that Parkinson had any assignment rights to BlueRadios. Id. ¶ 55.

Kopin is a Massachusetts corporation that designs and manufactures micro-display
technology. D. 227-1 ¶ 4; D. 247-1 ¶ 1. John C.C. Fan ("Fan") was Kopin's founder, Chairman,
Chief Executive Officer and President. D. 227-1 ¶ 4. Hong Choi ("Choi") was Kopin's Chief

---

[2] The Court notes that a number of the responses to statements of facts, see, e.g., D. 247-1,
contain some duplicitous paragraph numbering because they are responding to multiple statement
of facts and/or assert a statement of additional facts. The Court, however, has kept the citations to
the paragraph numbers as they appear in each document to conform with the citations in the parties'
briefing and because which paragraph the Court is referencing is clear from the context of the
Court's analysis.

3

Technology Officer.  Id.  Jeffrey J. Jacobsen ("Jacobsen") was a  Kopin employee and the  manager

for the development of Golden-i.  Id.; D. 247-1 ¶ 9; D. 252 ¶ 9.

In the fall of 2006, Kopin hired Jacobsen to develop the product called "Golden-i."

D. 227-1 ¶ 14.  BlueRadios and Kopin discussed a potential business relationship to design,

develop, and manufacture a headset, called "Golden-i," that would wirelessly play audio and

video.[3]  D. 247-1 ¶ 9; D. 227-1 ¶ 15.  On June 5, 2007, Kopin and BlueRadios entered a written

contract titled "Golden-i Wireless Video Design Solution" (the "Contract").  D. 230 ¶ 1; D. 247-1

¶ 14.  The Contract outlined each parties respective rights and obligations concerning Golden-i

development efforts.  Id.  The Contract contained the following relevant provisions:

> BlueRadios will own all rights, title and interest including intellectual property
> rights in any and all technology and products developed by it before the start of this
> contract or developed outside the scope of this contract.
>
> Any intellectual property rights developed by BlueRadios in the course of this
> development contract ("Joint Developments"), will be owned jointly with no
> obligation of financial accounting to the other party; provided, however, that
> BlueRadios agrees not to use, sell or license Joint Developments for any micro-
> display applications.
>
> Kopin will have the sole right and responsibility to decide whether or not to seek
> patent protection with respect to any intellectual property rights that are developed
> as part of or incorporated into the project deliverables and to file for, procure and
> maintain such patents at Kopin's expense.
>
> BlueRadios hereby grants Kopin an exclusive royalty-bearing (under Article V
> above) license to any solely owned BlueRadios intellectual property rights
> incorporated into the project deliverables to use, sublicense, make and have made,
> and sell products for all micro-display applications. . . .

D. 213-15 at 6-7; D. 230-1 ¶¶ 8, 10, 11; D. 247-1 ¶ 15; D. 252 ¶ 13.  Under the Contract, Kopin

agreed to pay BlueRadios $35,000 per month as a fixed retainer and pay BlueRadios a per-unit

---

[3] The parties dispute when they initially discussed forming a relationship in late 2006 or
early 2007, see D. 227-1 ¶ 15, but the date is immaterial to the Court's analysis.

4

royalty that was capped at $7.8 million.[4]  D. 252 ¶ 13.  Kopin also retained the right to cancel the Contract at any time with a 90-day written notice.  D. 230-1 <u>See</u> D. 227-1 ¶ 4.

Kopin and BlueRadios executed an addendum to the Contract on October 22, 2008. D. 252 ¶ 16.  The addendum waived the $35,000 monthly payment to BlueRadios and BlueRadios agreed to deliver ten "fully functional, stable, consistently operating" Golden-i hardware to Kopin. D. 247-1 ¶ 21; D. 213-18 at 2.  The royalty cap remained at $7.8 million.[5]  D. 247-1 ¶ 21; D. 213-18 at 2.  The addendum provided that the Contract continued to remain in full force and effect except as expressly modified.  D. 247-1 ¶ 22.  To date, no party has terminated the Contract.  D. 247-1 ¶ 23.

**B.**    <u>**Kopin Chose to Use the Law Firm to Prosecute Patents Relating to Golden-i**</u>

Kopin has previously used the Law Firm to file patents on their behalf since the 1990s. D. 247-1 ¶ 2.  Thibodeau, Pierce and Brook were shareholders of the Law Firm and registered patent attorneys with the United States Patent and Trademark Office ("USPTO").  D. 227-1 ¶¶ 7-9.  Thibodeau left the Law Firm in July 2012 and Mary Lou Wakimura ("Wakimura") took over the Golden-i patent portfolio.  D. 247-1 ¶ 199.  Cogswell became a shareholder of the Law Firm in January 2020 and is a patent attorney registered with the USPTO.  D. 227-1 ¶ 11; D. 247-1 ¶ 90.  Cogswell never communicated directly with BlueRadios during the time period.  D. 247-1 ¶ 91.  Kazanjian, Jean-Paul Cass ("Cass") and Matloff are former associates of the Law Firm and

---

[4]  Although BlueRadios disputes that Kopin was responsible for all costs and the characterization of this statement of fact, the Contract provided that there was a "monthly fixed NRE retainer of $35,000 per month" and there was a "$7.8M Royalty Income Cap."  D. 213-15 at 5-6.

[5]  BlueRadios disputes Defendants' characterization of the addendum, D. 247-1 ¶ 21, but the Court notes that the addendum states that the royalty cap is $7.8 million and BlueRadios waived the "existing" $35,000 monthly engineering services retainer under the Contract.  <u>See</u> D. 213-18 at 2.

are patent attorneys registered with the USPTO.  D. 227-1 at 4-5.  Matloff never had any ownership interest in the law firm or communicated directly with BlueRadios.  D. 247-1 ¶¶ 92-93.  Kopin did not have a written engagement letter with the Law Firm regarding prosecuting patents for the Golden-i project.   Id. ¶ 113; D. 252 ¶ 36.

In April 2007, Jacobsen told the Law Firm about Kopin's plan to work with BlueRadios to develop Golden-i.  D. 247-1 ¶ 24.  On May 2, 2007, Jacobsen wrote an email to Kramer that Cass is the lead counsel on Golden-i and Kramer forwarded that email to Tucker and told him to call the attorney to "see how we can help him."  D. 227-1 ¶ 26.  On June 19, 2007, two weeks after signing the Contract, BlueRadios was formally introduced to the Law Firm.  D. 247-1 ¶ 27.  Jacobson wrote an email to Kramer and Tucker stating that "JP Cass and David Thibodeau from Kopin's IP Law firm" would be contacting them to "organize the preparation of patent disclosures covering BlueRadios['] wireless technology." Id.  On June 27, 2007, Thibodeau emailed Jacobsen stating he had spoken with Tucker and BlueRadios was ready to "help document possible new inventions" concerning the "Kopin/BlueRadios jointly funded efforts on Golden-i" and asked Jacobsen to send a copy of the Contract.  D. 227-1 ¶ 42; D. 247-1 ¶¶ 121-22; see D. 211-16 at 2.  Although the parties dispute how much time Defendants spent initially reviewing the Contract, D. 247-1 ¶ 115, it is undisputed that the Law Firm reviewed and conferred concerning the Contract between Kopin and BlueRadios.  D. 227-1 ¶43; D. 247-1 ¶ 115.

### C.    BlueRadios's Relationship with the Law Firm Concerning Patent Prosecutions for Golden-i

In June and July 2007, BlueRadios and the Law Firm discussed areas for "possible new patent disclosures." D. 227-1 ¶ 41.  In August 2007, Jacobsen asked Tucker to work with the Law Firm to get on file the first patents concerning Bluetooth and wireless technology disclosures.  Id. ¶ 45.  Specifically, Jacobsen requested that BlueRadios create a "Master List" of

6

their unique technologies that could be patentable and then have BlueRadios and the Law Firm work together to create the explanations and specifications to support each patent.  Id. ¶ 46.

Most of the communications between BlueRadios and the Law Firm about patents and technology went through Jacobsen at Kopin, who was the project manager.  Id. ¶ 64; D. 247-1 ¶ 128.  Jacobsen confirmed that the "team" does not have any secrets and that there should be open communication between Kopin, BlueRadios and the Law Firm.  D. 227-1 ¶ 80.  BlueRadios did not make individual requests for the Law Firm to perform discrete tasks.  D. 247-1 ¶ 30. BlueRadios often referenced the Defendants as "Kopin lawyers."  Id. ¶ 37.  The Law Firm did not inform BlueRadios or provide them with any written notice that the Law Firm was not acting as BlueRadios's attorneys.  D. 227-1 ¶ 33.  The Law Firm did not advise BlueRadios that they should seek independent counsel or inquire whether BlueRadios had other patent counsel.  Id. ¶ 34.

### D.  The Law Firm Filed Patent Applications

Between January 2008 and January 2009, the Law Firm filed several Golden-i patent applications that named BlueRadios employees among the inventors.  D. 252 ¶ 26.  Upon publication, the entire file history for the patent application, including filings made after the publication date, can be viewed by anyone.  D 234-124 ¶ 43.  Defendants did not file any non-publication requests and the patent applications and their file histories were publicly visible.  Id. ¶ 45.

### 1.  Provisional Patent Applications

#### a)  '177 Provisional Patent Application

On December 4, 2007, Jacobsen emailed Thibodeau asking about the "initial patent disclosures" related to BlueRadios's and Parkinson's efforts.  D. 227-1 ¶ 69.  On December 6, 2007, Thibodeau emailed a first draft of the BlueRadios hardware patent application to Jacobsen

7

and Cass and copied Kramer, Tucker, Parkinson and Kopin employee, Steve Pombo ("Pombo"). Id. ¶ 70.  Thibodeau followed up on January 3, 2008 asking if they had reviewed the draft patent application.  Id. ¶ 71.  Thibodeau inquired as to who should be listed as inventors on the patent and Tucker and Kramer confirmed that Tucker, Kramer, Sample and Jones should be listed as investors.  Id. ¶¶ 72-73.  On January 4, 2008, the Law Firm filed U.S. Provisional Patent 61/010,177 (the "'177 Provisional Patent") that named BlueRadios's Tucker, Kramer, Sample and Jones as inventors.  D. 247-1 ¶ 42a.  The '177 Provisional Patent only names BlueRadios employees as inventors.  D. 227-1 ¶ 76.

In April 2008, Tucker emailed Thibodeau concerning modifications to patent applications for the '177 Provisional Patent and told him that he had updated two patents and documents and he was wondering what the status was and requested the Law Firm send him the submitted versions.  Id. ¶ 85.  Tucker sent revisions of the '177 Provisional Patent back to Thibodeau noting that Jacobsen had asked him to forward to the Law Firm his updates and requested that Thibodeau review them and "send me back any changes."[6]  Id. ¶ 87.

b)      '090 Provisional Patent Application

On January 4, 2008, Thibodeau filed U.S. Provisional Patent 61/010,090 (the "'090 Provisional Patent") that named Parkinson as the only inventor.  D. 247-1 ¶ 14.  On January 16, 2008, the Law Firm sent BlueRadios filed copies of the '090 Application.  Id. ¶ 56(b).  On December 31, 2008, Kramer emailed Tucker that he had read over the patent and that "it has specific claims that BlueRadios contributed or were original author for" and noted that "[n]ot listing someone from our Company is sort of reckless."  D. 252 ¶ 46.  Kramer further stated that

---

[6] Defendants dispute that Tucker sent revisions to the '177 Provisional Application as the revisions sent were made to the October 12, 2007 draft of the '177 Provisional Application that had been previously filed in January 2008.  D. 227-1 ¶ 87.

the "Patent Attorneys need to be aware of this" and questioned whether he should send the Law Firm a formal letter.  Id.  BlueRadios did not send a formal letter.  Id. ¶ 47.  Later that day, Tucker emailed Jacobsen stating that he believed that Sample should be added as an inventor to the '090 Provisional Patent.  D. 247-1 ¶ 17; D. 252 ¶ 47.  Tucker claimed that the Bluetooth proxy included in the '090 Provisional Patent was a concept that Parkinson and Sample had developed together.  D. 247-1 ¶ 17.  Jacobsen copied Tucker's message and sent it to Kazanjian on January 2, 2009.  Id. ¶ 18.  Kazanjian forwarded Jacobsen's email to Thibodeau and noted that the Law Firm needed to discuss "inventorship/reliance on the development agreement" and that "previous discussions to try to split things out may have been fruitless."  Id. ¶ 20.

### 2.  *Non-Provisional Patent Applications*

#### a)  '462 Application

On May 14, 2008, the Law Firm filed the U.S. Non-Provisional Patent 12/152, 462 (the "'462 Application"), which named Jacobsen, Pombo, Parkinson, Tucker and Sample as inventors.  D. 247-1 ¶ 21.  The '462 Application claimed the benefit of the '177 Provisional Patent and '90 Provisional Patent.  Id.

On November 21, 2008, Kazanjian sent Tucker a letter stating that he and Sample were listed as inventors on the '462 Application and noted that if the application was acceptable that they should sign the declaration.  Id. ¶ 23.  Tucker returned the signed declaration on December 24, 2008.  Id.  On January 8, 2009, Kazanjian only filed declarations signed by Pombo, Jacobsen and Parkinson, but did not file Tucker's declaration and the Law Firm did not tell Tucker that his declaration was not filed.  Id.  On May 7, 2009, the '462 Application was published, without listing any BlueRadios inventors and listing Kopin as the assignee, and its file history was made public by the USPTO.  D. 234-124 ¶ 43a.  The '462 Application issued as U.S. Patent 9, 116, 340 on

August 25, 2015.  D. 247-1 ¶ 25.

        a)      ‘627 Application

On January 5, 2009, Thibodeau filed the U.S. Non-Provisional Patent 12/348,627 (the "'627 Application") listing Kramer, Sample, Tucker and Jacobsen as inventors.  D. 247-1 ¶ 35. The ‘627 Application claimed the benefit of the ‘177 Provisional Application, which named Kramer, Sample, Tucker and Jones as inventors, and was also a continuation in part of the ‘462 Application.  Id. ¶ 36.  Kazanjian filed a power of attorney with the ‘627 Application.  D. 227-1 ¶ 124.

Prior to the filing, on December 22, 2008, Thibodeau emailed Tucker concerning the ‘627 Application, asked him to review the application and noted that the draft should include the updates Tucker sent via email in April and that the two of them should "plan to discuss the right way to handle invention(s) in the other applications."  Id. ¶ 106.  The draft of the ‘627 Application cited "U.S. Patent Application No. 12/152, 462 by Jacobsen, et al. and assigned to Kopin Corporation." D. 247-1 ¶ 57d.  On December 25, 2008, Tucker emailed Jacobsen, copying Thibodeau and Kazanjian, and noted that after reviewing the applications that he is "right" and that "there are important claims missing" and "anyone that contributed should be on them." D. 227-1 ¶ 107.  Four days later, Tucker sent Jacobsen an email asking for a copy of ‘462 Application referenced in the ‘627 Application to which Thibodeau replied, attaching copies of the ‘462 Application.  D. 247-1 ¶ 57e.

On January 4, 2009, BlueRadios made a request to the Law Firm to broaden the patent language to ensure the patent covered a WiFi embodiment, which the Law Firm did not do.[7]

---

[7] BlueRadios disputes that this is the only request it made to the Law Firm, D. 252 ¶ 28, but the Court notes that in its response, BlueRadios does not point to another specific request made to the Law Firm "to do something BlueRadios now claims [the Law Firm] should have done."  Id.

D. 227-1 ¶ 114 ; D. 247-1 ¶ 31; <u>see</u> D. 252 ¶ 28; D. 228-28 at 2.  On March 27, 2009, Tucker asked

Jacobsen for filed copies of certain patent applications, and Kazanjian sent Tucker, Jacobsen and

Parkinson filed copies of the '627 Application, which named Jacobsen, but not Jones as an

inventor.  D. 247-1 ¶ 59b.  That same day, Tucker forwarded the '627 Application to Kramer,

which lists Jacobsen as an inventor.  <u>Id.</u> ¶ 59c.  On April 21, 2009, Kramer sent Choi an executed

Declaration for the '627 Application which identified Jacobsen as an inventor.  <u>Id.</u> ¶ 59d.  On June

26, 2009, Choi sent an assignment for the '627 Application to Kramer, Tucker and Sample which

listed Jacobsen as an inventor.  <u>Id.</u> ¶ 59e.  On August 20, 2009, the '627 Application was published,

listing Jacobsen, but not Jones, as an inventor, and its file history was made public by the USPTO.

D. 234-124 ¶ 43b.  The '627 Application issued as a patent on January 15, 2013.  <u>Id.</u> ¶ 38.

b) <u>'646 Application</u>

On January 5, 2009, Thibodeau filed the U.S. Non-Provisional Patent 12/348,646 (the

"'646 Application") listing Parkinson, Tucker, Sample and Jacobsen as inventors.  D. 247-1 ¶ 28.

The '646 Application was a continuation of the '462 Application and claimed the benefit of the

'090 Application.[8]  <u>Id.</u>; D. 252 ¶ 26f.  On March 27, 2009, Kazanjian emailed Tucker the as-filed

version of the '646 Application, which listed Kopin Corporation as the "assignee."[9]

D. 247-1 ¶¶ 58a, 30.  On June 19, 2009, Kazanjian subsequently filed declarations for the '646

Application from Parkinson, Tucker, Sample and Jacobsen.  <u>Id.</u> ¶ 31.  On October 8, 2009, the

'646 Application was published, listing Kopin as the assignee, and its file history was made public

---

[8] Defendants dispute that '646 Application claimed the benefit of only the '090 Application,  D. 247-1 ¶ 28, because the '646 Application was a continuation of the '462 Application which claimed the benefit of the '177 and '090 Applications.  <u>See</u> D. 247-1 ¶ 21.  The Court notes, however, that it is undisputed that the '462 Application was amended in March 2009 to remove priority to the '177 Provisional Application.  <u>See</u> D. 247-1 ¶ 24.

[9] BlueRadios disputes that the form listed Kopin as the assignee, but the patent application does designate Kopin as the assignee for "publication purposes."  <u>See</u> D. 213-29 at 5.

11

by the USPTO.  D. 234-124 ¶ 43c.  The '646 Application issued as a U.S. Patent on December 9, 2014.  D. 247-1 ¶ 34.

        c)      <u>'147 PCT Application</u>

On May 14, 2008, the Law Firm filed International Application No. PCT/US08/06147 (the "147 PCT") with the World Intellectual Property Organization ("WIPO") in Geneva, Switzerland.  D. 247-1 ¶ 179.  As originally filed, the forty-four claims in the '147 PCT Application are identical to the claims in the '462 Application filed on the same day.  D. 234-124 ¶ 42c; D. 247-1 ¶ 180.  The '147 PCT lists Jacobsen, Pombo, Tucker and Sample as applicants and inventors.  D. 247-1 ¶ 182.  On March 19, 2009, the Law Firm wrote to WIPO and noted that Tucker had been incorrectly identified by the wrong name in the '147 PCT and Kramer and Jones were omitted and requested a correction of those errors.  <u>Id.</u> ¶ 189.  The Law Firm eventually abandoned the '147 PCT Application in 2011.  <u>Id.</u> ¶ 194.

      **E.**      **<u>BlueRadios is Removed From Certain Patent Applications</u>**

On March 6, 2009, Kazanjian subsequently filed an amendment to the '462 Application, which removed the '462 Application's claim of benefit to the '177 Provisional Application.  D. 247-1 ¶ 24.  The amendment corrected inventorship to reflect that only Jacobsen, Parkinson and Pombo were listed as investors.  <u>Id.</u>  The Law Firm did not tell Tucker and Sample that they had been removed as inventors on the '462 Application.  <u>Id.</u>

In June 2012, the Law Firm emailed Choi about the '646 Application and "strategies for handling BlueRadios related claims" relating to overcoming a rejection concerning that patent application.  D. 247-1 ¶ 197.  The Law Firm discussed that one way to make changes to the list of inventors would be to file a continuation which would cancel claims having the BlueRadios subject matter and list only Kopin inventors.  <u>Id.</u>  Choi responded that he preferred to file a new

continuation application with the revised claims that involved Kopin inventors only.  Id. ¶ 201.  In August 2012, Matloff worked with Choi to amend the '646 Application.  D. 247-1 ¶ 202.  On September 16, 2012, Matloff filed a Request for Correction/Amendment of Inventorship requesting that the USPTO amend the application and remove Tucker and Sample as inventors based on an amendment to the claims.  Id. ¶ 32.  The Law Firm did not inform BlueRadios of this change to the '646 Application.  Id.

### F.     BlueRadios Hires a Patent Attorney to Understand BlueRadios's Patent Portfolio

BlueRadios last directly communicated with the Law Firm in June 2009.  D. 252 ¶ 52. BlueRadios's relationship with Kopin also broke down around July 2009.  Id. ¶¶ 48-49, 51.

In 2011, BlueRadios hired James Klobucar ("Klobucar") as a contract patent attorney. Id. ¶ 54.  Klobuchar prepared and filed patent applications and conducted patent assessments for BlueRadios.  Id.  On August 14, 2014, Kramer contacted Kopin concerning BlueRadios being approached about an acquisition from Google and asked about the "past IP" to have a better understanding of the intellectual property protection surrounding the Golden-i project.  D. 247-1 ¶ 41; D. 252 ¶ 56.  Jacobsen directed Kramer to contact Choi about the Golden-i patent portfolio, but Choi never responded.  D. 247-1 ¶ 41.  After this exchange with Kopin, BlueRadios conducted their own inquiry into the patent portfolio and noted that "we couldn't find our names on patents that we were claimed to be put on from Kopin and our patent attorney HBSR."[10]  D. 248-8 at 3; see D. 247-1 ¶¶ 42-44.

---

[10] Although BlueRadios disputes that they had inventorship concerns at the time they engaged Klobucar in November 2014 as described further below, BlueRadios does not dispute, that Kramer conducted this patent inquiry prior to engaging him for his patent search and review. See D. 247-1 ¶¶ 43-44; D. 244; D. 261.

On November 14, 2014, BlueRadios emailed Klobucar to obtain more information about the status of the Golden-i project.  D. 247-1 ¶ 43; D. 252 ¶ 57a.  In the email, BlueRadios asked Klobucar to "search for patents" filed under Sample, Tucker, Kramer, Parkinson or Jacobsen.  D. 252 ¶ 57d.  That same day, Klobucar billed to a matter titled "Golden-i" for an initial patent search and contract review.  Id. ¶ 57f.  On November 26, 2014, Klobucar compiled a list of "patents and patent applications" that he identified based on his search of the patent history and noted the status of the patent application, certain aspects of the prosecution history, and who was currently listed and who had been previously listed as an inventor.  D. 234-24 ¶¶ 6-7; see D. 247-1 ¶ 73c.

In January 2015, Klobucar billed for drafting a "letter regarding inventorship" and eventually sent that demand letter and another letter to the Law Firm on May 13, 2015 and October 28, 2015.  D. 252 ¶ 59.  In these letters to the Law Firm, Klobucar noted, among other things, that there were inconsistencies and inaccuracies in the patent applications and it was "troubling" that the patent application publications listed Kopin as the assignee.  Id. ¶ 61.  Klobucar did not state in the letters that the Law Firm had ever represented BlueRadios.  Id.  ¶ 62.

### G.  **BlueRadios Sues Kopin in Colorado for Breach of the Golden-i Contract**

In August 2016, BlueRadios sued Kopin in the United States District Court for the District of Colorado for, among other things, allegations of breach of contract relating to the Contract.  D. 250 ¶ 22-23; D. 252 ¶ 65.  BlueRadios moved to disqualify the Law Firm as Kopin's litigation counsel in the Colorado suit, alleging that the Law Firm had been BlueRadios's attorneys.  D. 252 ¶ 66.  BlueRadios alleged that the Law Firm served as its counsel from 2007 to 2016 under the Contract.  Id. ¶ 68.  BlueRadios and the Law Firm entered a tolling agreement on December 5, 2017.  D. 247-1 ¶ 87.

## IV.    Procedural History

BlueRadios instituted this action on March 22, 2021, D. 1, and then amended its complaint, D. 47.  Defendants moved to dismiss certain of the claims, D. 54.  The Court allowed the motion to dismiss as to Counts I and II against Matloff, and the civil conspiracy claim (Count VI) against all Defendants, but otherwise denied the motion.  D. 69.  BlueRadios has now moved for partial summary judgment on the issue of whether an attorney-client relationship existed between Defendant Law Firm and BlueRadios, D. 208, and on the issue of whether BlueRadios could have terminated the Contract with Kopin, D. 204.  Defendants have moved for summary judgment as to all claims.  D. 209.  The Court heard the parties on the pending motions, and took these matters under advisement.[11]  D. 257.

## V.    Discussion

### A.    BlueRadios's Claims Are Barred by the Statute of Limitations

Defendants assert that BlueRadios's claims are time-barred because BlueRadios should have discovered any misconduct as early as 2008 but no later than November 2014.  D. 214-1 at 7-12.  BlueRadios counters that its claims did not accrue on or before December 5, 2014 and it did not learn that it had suffered appreciable harm by the Law Firm until spring 2017, and the statute of limitations are subject to tolling under the continuous representation and fraudulent concealment doctrines.  D. 244 at 4-11.

---

[11] Following the hearing, BlueRadios filed a motion for leave to file a sur-reply in support of its response to Defendants' motion for summary judgment, D. 261, which Defendants opposed, D. 262.  The Court notes that the information provided in the excerpts of the deposition transcript, D. 261-1 at 3-7, is substantively similar to the information in the Klobucar affidavit that was already in the record.  Compare D. 261-1 with D. 234-24.  The Court, therefore, grants the motion for leave *nunc pro tunc* and has considered both the sur-reply and Defendants' opposition to same, D. 261; D. 262, in resolving the pending motions.

There is a three-year statute of limitations for legal malpractice, fraudulent concealment, breach of fiduciary duty and aiding and abetting such claims, Mass. Gen. L. c. 260 § 4 and a four-year statute of limitations applies for Chapter 93A claims. Mass. Gen. L. c. 260 § 5A; see Int'l Strategies Grp., Ltd. v. Greenberg Traurig, LLP, 482 F.3d 1, 14 (1st Cir. 2007) (recognizing, under Massachusetts law, aiding and abetting tort claims have a three-year statute of limitations). Here, it is undisputed that the parties entered into a tolling agreement in December 5, 2017. See D. 247-1 ¶ 87. For BlueRadios claims to be timely, BlueRadios must show that they did not discover the harm until after December 5, 2013 for their Chapter 93A claim and after December 5, 2014 for their other claims.[12] D. 214-1 at 8; D. 244 at 4.

---

[12] The parties dispute whether a three or four-year statute of limitations applies to BlueRadios's Chapter 93A claim. See D. 214-1 at 8; D. 244 at 4. Defendants contend that the Chapter 93A claim is subject to a three-year statute of limitations because it is predicated on the same facts underlying BlueRadios's other tort claims. See D. 214-1 at 8. This position has been adopted where the Chapter 93A claim, as here, is merely a recasting of their malpractice or breach of fiduciary duty claims. See, e.g., Alves v. Cohan, No. 22-P-720, 2023 WL 2903418, at *4 (Mass. App. Ct. Apr. 12, 2023) (unpublished opinion) (applying three-year statute of limitations to Chapter 93A claim that merely recast the legal malpractice claim), review denied, 492 Mass. 1102 (2023); Tocci v. Holland & Knight, LLP, 21-P-1023, 2022 WL 3129971, at *2 (Mass. App. Ct. Aug. 5, 2022) (unpublished opinion) (applying a three-year statute of limitations to plaintiff's Chapter 93A claim predicated on its breach of fiduciary duty claim). Although it does not appear that the Supreme Judicial Court has squarely addressed this issue, its case law also lends support to same. See Hendrickson v. Sears, 365 Mass. 83, 85 (1974) (acknowledging that "limitation statutes should apply equally to similar claims regardless of the form of proceeding"); Passatempo v. McMenimen, 461 Mass. 279, 292 (2012) (declining to apply a different statute of limitations to the 93A claim because "plaintiffs have not merely repackaged claims" and have made a permissible election between overlapping but distinct remedies and harms); cf. Solfisburg v. Glenco, Inc., No. 18-cv-10266-IT, 2022 WL 20086812, at *9 (D. Mass. Feb. 2, 2022) (declining to dismiss the chapter 93A claim because the other underlying claims failed based on a three-year statute of limitations and also noting the Chapter 93A claim also survives summary judgment applying the four-year statute of limitations). Although concluding that BlueRadios has pled their 93A claim as a recasting of their other tort claims, D. 47 ¶ 462 and a three-year statute of limitations applies, the Court analyzes this claim under the longer, four-year statute of limitations since BlueRadios's claim is untimely even under this longer limitations period. See Tocci, 2022 WL 3129971, at *2 n.7 (noting that even if we "consider the G.L. c. 93A claim under a four-year statute of limitations, the plaintiff's claims would be barred").

Under the discovery rule, the statute of limitations starts when the plaintiff discovers, or reasonably should have discovered, "that [he] has been harmed or may have been harmed by the defendant's conduct." Koe v. Mercer, 450 Mass. 97, 101 (2007) (quoting Bowen v. Eli Lilly & Co., 408 Mass. 204, 205-06 (1990)). Once a client or former client knows or reasonably should know that he has sustained appreciable harm as a result of the lawyer's conduct, the statute of limitations starts to run. Williams v. Ely, 423 Mass. 467, 473 (1996). "Appreciable harm includes 'injury, loss or detriment' that is 'capable of being measured or perceived.'" Frankston v. Denniston, 74 Mass. App. Ct. 366, 374 (2009) (internal citations omitted). For legal malpractice claims, one measure of appreciable harm is when a plaintiff expends additional legal fees to ameliorate the harm caused by the attorney's malpractice. See Rosen Const. Ventures, Inc. v. Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C., 364 F.3d 399, 405 (1st Cir. 2004). If a defendant pleads the statute of limitations and shows that the action started more than three years after plaintiff's injury, "the plaintiff has the burden of proving that the facts take the case outside of the statute of limitations." Williams, 423 Mass. at 474; Koe, 450 Mass. at 101 (recognizing that a plaintiff invoking the discovery rule in response to a summary judgment motion, "must demonstrate a reasonable expectation of proving that the claim was timely filed").

          *1.*      *BlueRadios was on Constructive Notice of Their Claims as of 2008 and 2009*

BlueRadios contends that the Law Firm engaged in misconduct by depriving BlueRadios of inventorship, ownership and assignment rights in several patents, including, the '090 Application, the '627 Application, ' 462 Application, '646 Application and '147 PCT. See D. 47 ¶¶ 170-81, 215-78, 292-312. The Court agrees with Defendants that BlueRadios had knowledge

of the issues of which BlueRadios has complained of concerning inventorship and assignment rights as early as 2008 and 2009.  See D. 214-1 at 8-9.

        a)      The '090 Application

The undisputed facts indicate that BlueRadios first had notice of potential issues with inventorship in 2008.  On January 16, 2008, the Law Firm forwarded BlueRadios filed copies of the '090 Application in which the application only named Parkinson as an inventor, which BlueRadios has alleged was incorrect.  See D. 247-1 ¶¶ 49, 56b; D. 47 ¶ 174 (alleging that "[n]either Parkinson nor any Kopin employee contributed to the conceptions of the inventions reflected" in the '090 Application).  Moreover, on December 31, 2008, Kramer emailed Tucker that he had read over patent applications and that "it has specific claims that BlueRadios contributed or were original author for" and noted it was "sort of reckless" for the Law Firm to leave off Tucker as an inventor on the '090 Application.  D. 247-1 ¶ 60; D. 252 ¶ 46.  Kramer acknowledged that the "Patent Attorneys need to be aware of this" and questioned whether he should send the Law Firm a formal letter.  D. 252 ¶ 46.  Following this exchange, BlueRadios did not send a formal letter to the Law Firm, but Tucker requested that Sample be added as an inventor to the '090 Application.  D. 247-1 ¶ 61.  "In malpractice cases alleging the negligent provision of professional advice, expressions of misgiving are compelling proof that the plaintiff was on notice."  RTR Techs., Inc. v. Helming, 815 F. Supp. 2d 411, 421 (D. Mass. 2011); Lyons v. Nutt, 436 Mass. 244, 249 (2002) (reasoning that plaintiff was on notice of his claims when he first expressed misgivings that his attorneys did not know what they were doing and a plaintiff need only know that he has sustained appreciable damage as a result of lawyer's conduct and "need not know that his lawyer was negligent for the cause of action to accrue").  Although BlueRadios contends that it "had no idea" about the determination of inventorship and the connection between

any harm and the Law Firm, D. 244 at 5-8, this argument is unpersuasive, as here, Kramer undisputedly stated in the email that the Law Firm was "reckless" for not ensuring the right inventorship and contemplated sending formal notice of his reservations which indicates that BlueRadios was on notice of the Law Firm's role in the alleged harm.  The Court, therefore, concludes that BlueRadios had notice of any inventorship issues as of December 2008 concerning the '090 Application.[13]

b)      '462 Application

As to the '462 Application, the undisputed facts indicate that BlueRadios had notice that the '462 Application incorrectly named Kopin as the sole assignee in December 2008.  See D. 247-1 ¶ 57d; D. 47 ¶ 235 (alleging that "the Law firm incorrectly named Kopin as the sole assignee of the '462 Application, despite knowledge that BlueRadios'[s] employees had assigned their inventive rights to BlueRadios and knowing the terms of the Golden-i Contract").  On December 22, 2008, Thibodeau sent Tucker a draft of the '627 Application and the text of the draft included

---

[13] Although BlueRadios claims that the '090 Application cannot serve as a basis for accrual because it was a provisional patent and therefore incapable of producing harm, D. 244 at 6-7, this argument is unavailing as BlueRadios has brought claims against the Law Firm based on inconsistencies in the '090 Application that "assist Kopin in attempting to obtain sole ownership of the technology disclosed in the '090 Provisional Application and any related patent applications, to the detriment of BlueRadios."  See D. 47 ¶ 180; see id. ¶¶ 166-81.  Further, BlueRadios's reliance upon Gilead Scis., Inc. v. United States, 151 Fed. Cl. 742, 748 (2020) (internal citations omitted), is inapplicable because the harm Gilead alleged included the "risk of patent infringement damages" which would not have incurred until the government gained the right to enforce the patent against Gilead.  Id.  Here, the harm that BlueRadios alleged was incorrect inventorship, which formed the basis, for example, of its breach of fiduciary duty claim, and therefore the statute of limitations began when BlueRadios was alerted to the factual basis of its claims.  See D. 47 ¶ 411;  Geo. Knight & Co. v. Watson Wyatt & Co., 170 F.3d 210, 214 (1st Cir. 1999) (affirming that plaintiff's claims for breach of fiduciary duty and Chapter 93A were time-barred because the forms filed annually on behalf of plaintiff expressly stated the issue that plaintiff complained of and "there can be no question that [plaintiff] had sufficient information—indeed, all of the information—it needed to know of the alleged 'underfunded' condition of the Plan" that formed the basis for its claims) (emphasis in original).

the language that the '462 Application was assigned to Kopin.  See D. 247-1 ¶ 57d.  On December 29, 2008, Tucker sent Jacobsen and Thibodeau an email acknowledging the language in the '627 Application that stated the '462 Application was assigned to Kopin and requested a copy of the file.  Id. ¶ 57e.  Thibodeau replied, stating that the '462 Application "was filed in May" and provided another copy of the text and drawings.  Id.; D. 213-57 at 2.  On this record, BlueRadios cannot dispute that it was on notice of the factual basis for its claim that the Law Firm had incorrectly assigned the '462 Application to Kopin as of December 22, 2008.  See Tocci, 2022 WL 3129971, at *2 (reasoning that plaintiff's claims were time-barred because the statute of limitations began when the plaintiff had notice of "the particular wrongdoing that formed the basis of his claims" even if the plaintiff "was not at the time aware of all details of the potential claims arising from that conduct").

### c) The '627 Application

The undisputed facts indicate that BlueRadios had notice in March 2009 for the factual basis of its complaint that the '627 Application incorrectly named Jacobsen as an inventor and omitted Jones as an inventor.  D. 247-1 ¶ 59; D. 47 ¶¶ 222-23.  On March 27, 2009, Tucker received the filed version of the '627 Application in which the application identified Jacobsen, Kramer, Sample and Tucker, but not Jones, as inventors.  D. 247-1 ¶ 59b.  That same day, Tucker forwarded the '627 Application to Kramer.  Id. ¶ 59c. Although BlueRadios maintains that they only discovered in the Colorado litigation in 2017 that Jacobsen may have been erroneously added, D. 244 at 7-8, BlueRadios claims are predicated on allegations that "Jacobsen did not contribute to the conception of the subject matter described in any of the claims in, and should not have been named as an inventor on, the '627 Application,"  D. 47 ¶ 222, and that Jones should have been named an inventor on the '627 Application.  Id. ¶ 223.  BlueRadios has acknowledged that the

20

ADD20

Law Firm was responsible for deciding who was listed as an inventor on the patent applications. See D. 234-3 at 39-40. As the undisputed facts show that BlueRadios received a filed copy of the '627 Application in March 2009 which excluded Jones and may have incorrectly added Jacobsen, and BlueRadios understood that the Law Firm listed the inventors on the patents, BlueRadios was on sufficient notice of the inventorship concerns that it now complains of in the '627 Application. If BlueRadios had reservations about inventorship, it had a duty to inquire further at this time. See Koe, 450 Mass. at 102-03 (recognizing that "the discovery rule does not grant plaintiffs the option of ignoring connections once they have been made aware of them" and once plaintiffs have sufficient knowledge or notice they have "a duty to act or at least inquire further").

> d)    '646 Application

BlueRadios was also on notice of its complaint in March 2009 that the Law Firm incorrectly named Kopin as the sole assignee of the '646 Application despite knowledge that BlueRadios's employees had inventor rights. See D. 47 ¶¶ 244-45. It is undisputed that on March 27, 2009, the Law Firm emailed Tucker the as-filed version of the '646 Application which listed Kopin as the "assignee" of the patent. D. 247-1 at ¶¶ 58a, 30; see D. 213-29 at 5. BlueRadios disputes that Kopin was listed as the assignee of the patent application and argues that Kopin was only listed as the assignee for publication purposes. D. 247-1 at ¶ 58a. Even if Kopin was only listed as the assignee for publication purposes, as BlueRadios has alleged that sole assignment to Kopin was incorrect, D. 47 ¶¶ 244-45, BlueRadios was on notice that there was a potential issue with assignment and had a duty to inquire further at that time. See Koe, 450 Mass. at 102-03; Geo. Knight & Co. 170 F.3d at 215 (reasoning that plaintiff's failure to make further inquiry to resolve an apparent inconsistency precluded a finding that the plaintiff exercised diligence in discovering the basis for its claims).

e)    <u>The Patent Applications Were Publicly Available</u>

Moreover, although BlueRadios argues that it had "no reason to know" that the Law Firm had failed to add Sample as an inventor to the '090 Application or had removed BlueRadios from certain patent applications, D. 244 at 7-8, "[u]nder Massachusetts law, a fact is not inherently unknowable[14] when it is a matter discoverable by examination of public records." <u>Wise v. Hubbard</u>, 769 F.2d 1, 2–3 (1st Cir. 1985). Here, BlueRadios does not dispute that the above patent applications were filed publicly and could be viewed by anyone, and therefore, the basis for BlueRadios's claims were discoverable in 2009. <u>See</u> D. 234-124 ¶¶ 44-46. For example, it is undisputed that the '462 Application published without listing any BlueRadios inventors and listing Kopin as the assignee on May 7, 2009, the '627 Application was published on August 20, 2009 and listed Jacobsen, and not Jones, as an inventor and the '646 Application was published on October 8, 2009 and listed Kopin as the assignee. <u>Id.</u> ¶43. Based on the numerous representations made to BlueRadios of the facts underlying the basis of the claims and well as the ability for them to independently discover any alleged issues with the patents as they were publicly visible, BlueRadios was on notice of their claims as of 2009 at the latest as no reasonable jury could find that BlueRadios acted with the requisite level of diligence in discovering the purported inconsistencies in ownership and inventorship underlying the basis for their claims. <u>See</u> <u>Geo. Knight & Co.</u>, 170 F.3d at 215; <u>Wise</u>, 769 F.2d at 3 (concluding that plaintiff's conversion claim for listing an incorrect inventor on a patent was time-barred because plaintiff could have discovered the basis for his claims earlier based upon the publication of the patent).

---

[14] The "inherently unknowable" standard is the equivalent of the "knew or should have known" standard. <u>Davalos v. Bay Watch, Inc.</u>, No. SJC-13534, 2024 WL 4031129, at *4 (Mass. Sept. 4, 2024).

2.     *BlueRadios had Notice of its Claims in November 2014 at the Latest*

Defendants further argue that BlueRadios, at the latest, had notice of their claims in November 2014 when BlueRadios engaged Klobucar to evaluate its patent portfolio.  D. 214-1 at 11-12.  Specifically, the parties contest whether BlueRadios had knowledge as of November 26, 2014 that it had suffered harm based on a chart that Klobucar compiled of the patent history.  See D. 214-1 at 11-12; D. 244 at 8-9; D. 261-1 at 3-7; D. 262 at 4-6.  The undisputed evidence indicates that Klobucar compiled a list of "patents and patent applications" that he identified based on his search of the patent history and noted the status of the patent application, certain aspects of the prosecution history, and who was currently listed and who had been previously listed as an inventor.  D. 234-24 ¶¶ 6-7; id. at 17; see D. 247-1 ¶ 73c.  Klobucar's chart identified (1) that Tucker and Sample had been deleted as inventors from the '646 Application, (2) that there were inconsistencies in the named inventors of the '462 Application which listed Tucker and Sample on the filed document but the patent only currently listed Jacobsen, Parkinson and Pombo as inventors, (3) the '627 Application had issued as a patent that had named Kramer, Sample, Tucker and Jacobsen as inventors and (4) that the '147 PCT patent had been abandoned.  See D. 234-24 at 17; D. 248-48 at 23-37, 39-44.  Klobucar also searched for assignments and noted that patents were assigned to Kopin, but not BlueRadios.  See D. 248-48 at 10-13.  Defendants contend that Klobucar's list directly relates to BlueRadios's claims in this case, and therefore, was sufficient to put BlueRadios on notice that they had suffered appreciable harm because any knowledge that Klobucar gained was imputed to BlueRadios.  D. 246-1 at 5; D. 262 at 4-5; see D. 234-24 at 17.  BlueRadios counters that BlueRadios did not have notice of harm because at the time it asked Klobucar to evaluate the patents it was concerned about royalty payments from Kopin and not inventorship.  D. 244 at 8.  BlueRadios further argues, and Klobucar testified, that he did not

evaluate the patents for their correctness in November 2014.  See D. 261-1 at 3-7; D. 234-24 ¶ 8.

Klobucar testified that he shared the information he complied with BlueRadios around mid-

December 2014.  See 248-48 at 5.

The Court is not persuaded that BlueRadios has adduced sufficient evidence to show a

factual dispute that BlueRadios was not on notice of harm by November 2014 at the latest.  Kramer

testified in the Colorado litigation that in August 2014 BlueRadios undertook to understand the

complete list of patents and the value of them because of a potential acquisition and initiated

contact with Jacobsen to "get an estimate of what [Kopin] thought the patents were worth."  D.

247-1 ¶ 72, 41; D. 248-16 at 3-5.  The record indicates that on August 13, 2014, Kramer emailed

Jacobsen at Kopin indicating that a company approached BlueRadios about being acquired and as

part of that due diligence process, Kramer wanted to "discuss and gain a better understanding of

some of the past IP for proper financial evaluation."  D. 247-1 ¶ 72; D. 213-69 at 3; D. 234-53 at

3.  On August 14, 2014, Jacobsen replied that Kramer would need to discuss "Kopin's patent

filings, issued patents and product rights under Kopin's agreements" as well as any questions on

royalties with Choi.  D. 247-1 ¶¶ 41-42; D. 213-69 at 2; D. 234-53 at 2.  Kramer further testified

that "[w]e were searching and we couldn't find our names on patents that we were claimed to be

put on from Kopin and our patent attorney HBSR."  D. 248-8 at 3; see D. 247-1 ¶ 42.  Kramer

stated that he then asked a patent attorney to "find the history of what happened to these patents"

after he tried conducting his own search of the USPTO.  D. 248-8 at 4; see D. 247-1 ¶ 43.  Kramer

further testified that he went back to the client and told him that there was a problem because "our

names don't show on the patents" and realized that it would be "hard to sell a company based on

[intellectual property] when you're taken off dozens of patents."  D. 248-8 at 4; D. 248-16 at 5.

The fact that BlueRadios conducted their own inquiry and then hired an attorney to look into the

patent history because they were not finding their names on patents was sufficient to provide notice

of harm and accrual of the statute of limitations.[15] See HDH Corp. v. LaFlamme, No. 03-P-1355,

2004 WL 2331715, at *2 (Mass. App. Ct. Oct. 15, 2004) (unpublished opinion) (recognizing that

"[t]he incurring of legal fees constitutes a sufficiently appreciable harm for purposes of the accrual

of a cause of action"); see also Fessenden Sch. v. Hub Int'l Ltd., 20-P-1171, 2021 WL 2742803, at

*3 (Mass. App. Ct. July 1, 2021) (unpublished opinion) (concluding that plaintiff suffered

appreciable harm when it incurred the cost of an investigation and firm was retained because "the

insurer's policies could not be located . . . and further investigation was required" despite the fact

that plaintiff claimed that the work was related to negotiations with a different entity).

BlueRadios also had knowledge of the facts that Klobucar discovered during the course of

his patent search, including that Kopin was the sole assignee for certain patents, BlueRadios was

deleted as inventors on certain patents and the Law Firm were the attorneys prosecuting the patents.

See D. 234-24 at 17; DeVaux v. Am. Home Assur. Co., 387 Mass. 814, 818 (1983) (recognizing

that "[w]hen an agent acquires knowledge in the scope of her employment, the principal, . . ., is

held to have constructive knowledge of that information"). Although BlueRadios contends that

---

[15] The cases that BlueRadios cite for the premise that BlueRadios hiring Klobucar to review BlueRadios's patent portfolio did not constitute appreciable harm, D. 244 at 8-9, do not warrant a different outcome here. See Rosen Constr. Ventures, Inc., 364 F.3d at 406-07 (reasoning that plaintiff had not suffered appreciable harm when it hired another attorney because law firm continued to provide repeated assurances that plaintiff would prevail and therefore plaintiff engaged another attorney for reasons unrelated to dissatisfaction with representation); St. Paul Fire & Marine Ins. Co. v. Birch, Stewart, Kolasch & Birch, LLP., 379 F. Supp. 2d 183, 197 (D. Mass. 2005) (reasoning that plaintiff was not on notice of appreciable harm when attorney repeatedly provided assurances that he was acting aggressively in filing a meritless case and there was no evidence that plaintiff had questioned or was otherwise dissatisfied with the attorney's representation). Here, there is no evidence that Defendants provided any such assurances to BlueRadios. Moreover, BlueRadios did incur appreciable harm by engaging Klobucar review the patent history because Kramer recognized that he could not find BlueRadios's names on the patents that were claimed to be put on from Kopin and the Law Firm. D. 248-8 at 3; D. 247-1 ¶ 42; Fessenden Sch., 2021 WL 274803, at *3.

Klobucar was not tasked with understanding whether the patents were correct, D. 244 at 8-9, Klobucar did recognize at least some of the harm that BlueRadios complains of now as he testified that when he was conducting patent searches, he believed that assignment should have reflected both BlueRadios and Kopin as assignees based on the Contract, and "reviewed to determine if that was, indeed, the case," but identified that at least some of the patent applications were just assigned to Kopin.[16]  See D. 248-48 at 11-13; Levin v. Berley, 728 F.2d 551, 553 (1st Cir. 1984) (reasoning that the attorney's knowledge was imputed to the client for purposes of accrual).  On this record, at the time Klobucar compiled the list, a factfinder could not reasonably conclude that BlueRadios did not have notice of the harm as BlueRadios contends that the harm in this case was the loss of "valuable intellectual property rights," D. 244 at 30, recognized that it would be "hard to sell a company based on [intellectual property] when you're taken off dozens of patents," D. 248-8 at 4, and Klobucar's list outlines the factual basis of BlueRadios claims in this case, D. 246-1 at 5; see D. 234-24 at 17; Frankston, 74 Mass. App. Ct. at 373-74 (reasoning that the plaintiff need not know the extent of the alleged malpractice for the statute of limitations to commence and concluding that plaintiff was on notice when he was made aware of "the very issues that underlie the alleged legal malpractice" claim).  For all these reasons, the Court holds that BlueRadios's

---

[16] BlueRadios's argument that any knowledge of harm could not be imputed to Klobucar because he did not understand BlueRadios's relationship with the Law Firm, D. 261-1 at 3-7, 6 n.8 (citing cases), does not amount to a disputed issue of material fact because it is undisputed that Klobucar understood the material relationship (i.e. the Kopin-BlueRadios relationship as governed by the Contract in which they agreed to joint assignment of intellectual property, see D. 248-48 at 11-13) and understood that the Law Firm submitted the patent applications.  See id. at 19, 24-25, 29-33, 36, 45-46.

claims accrued before December 5, 2013 for its Chapter 93A claim and December 5, 2014 for all other claims, and are, therefore, barred by the statute of limitations.

### 3. Tolling is Not Applicable

BlueRadios's claims are not saved under either the continuous representation or fraudulent concealment tolling doctrines. See D. 214-1 at 12-13; D. 244 at 9-11.

#### a) The Continuous Representation Doctrine

A statute of limitations may be tolled under the continuous representation doctrine which "recognizes that a person seeking professional assistance has a right to repose confidence in the professional's ability and good faith, and realistically cannot be expected to question and assess the techniques employed or the manner in which the services are rendered." Cantu v. St. Paul Co., 401 Mass. 53, 58 (1987) (citation omitted). "The doctrine has no application, however, where the client actually knows that he suffered appreciable harm as a result of his attorney's conduct." Lyons, 436 Mass. at 250. BlueRadios contends that the doctrine is applicable here because the Law Firm continued to update patents through at least August 25, 2015 and that neither BlueRadios nor the Law Firm ever formally terminated their relationship. See D. 244 at 10.

First, and as discussed further below, BlueRadios cannot rely upon the continuous representation doctrine because there was no attorney-client relationship. See Int'l Strategies Grp., Ltd., 482 F.3d at 14 (recognizing that the continuous representation doctrine was inapplicable to toll the statute of limitations because there was no attorney-client relationship). Even assuming arguendo that BlueRadios had an attorney-client relationship with the Law Firm, BlueRadios had expressed misgivings of the Law Firm's behavior as early as 2008 by noting that Defendants' conduct was "sort of reckless," D. 252 ¶ 46, and, therefore, the doctrine is inapplicable. See Cantu, 401 Mass. at 58 (reasoning that "the innocence reliance which the continued representation

doctrine seeks to protect" was not implicated because plaintiff "had questioned and had assessed [the attorney's] representation of his interest and found it to be wanting").

Second, it is undisputed that the last communication BlueRadios had with the Law Firm was in June 2009, D. 252 ¶ 52, and aside from BlueRadios's assertion that the Law Firm continued to represent its interests, D. 244 at 10, BlueRadios has adduced no evidence that the Law Firm had any further communication with it, much less provided any legal guidance after 2009. See Int'l Strategies Grp., Ltd. v. Greenberg Traurig, LLP, No. 04-cv-12000-RWZ, 2006 WL 229034, at *4 (D. Mass. Jan. 30, 2006) (concluding that the continuous representation doctrine did not apply because the record was "devoid" of any evidence that plaintiff relied upon attorneys for continued legal advice and there was "no evidence of any assurances or communication at all" between plaintiff and the attorneys). Although BlueRadios contends that the Law Firm continued to represent its interests by prosecuting a single patent naming BlueRadios in August 2015, D. 244 at 10, the "ministerial acts" of updating the patents is insufficient to toll the statute of limitations because where the Law Firm did not provide any legal advice to BlueRadios by these updates. Spatorico v. Egan, Flanagan & Cohen, P.C., No. 19-cv-30090-KAR, 2022 WL 4586465, at *10 (D. Mass. Sept. 29, 2022) (reasoning that an attorney's ministerial acts did not toll the statute of limitations because the attorney did not provide any legal advice), aff'd sub nom. Spatorico v. Egan Flanagan & Cohen, PC, No. 22-1812, 2023 WL 11198259, at *1 (1st Cir. Nov. 9, 2023). Accordingly, there is no basis for the continuous representation doctrine to toll the statute of limitations.

b)    The Fraudulent Concealment Doctrine

BlueRadios's alternative argument that the statute of limitation is tolled by the fraudulent concealment doctrine is equally inapplicable. See D. 244 at 10-11. An action may be tolled "[i]f

28

a person liable to a personal action fraudulently conceals the cause of such action from the knowledge of the person entitled to bring it, the period prior to the discovery of his cause of action by the person so entitled shall be excluded in determining the time limited for the commencement of the action." Mass. Gen. L. c. 260 § 12. "When the defendant owes the plaintiff a fiduciary duty, the failure to mention material circumstances related to that duty can constitute fraudulent concealment." Moretti v. Deveau, No. 85-3930-Z, 1987 WL 9763, at *2 (D. Mass. Apr. 1, 1987). Even where there is a fiduciary relationship, however, the fraudulent concealment doctrine does not apply when the plaintiff has actual knowledge of the facts underlying their claims. Demoulas v. Demoulas Super Markets, Inc., 424 Mass. 501, 519 (1997); Stark v. Advanced Magnetics, Inc., 50 Mass. App. Ct. 226, 234 (2000) (recognizing that the statute will "not be tolled if the plaintiff also had the means to acquire the facts on which his cause of action is based"). In the absence of a fiduciary relationship, the statute of limitations may be tolled under the fraudulent concealment doctrine "if the wrongdoer . . . concealed the existence of a cause of action through some affirmative act done with intent to deceive." Epstein v. C.R. Bard, Inc., 460 F.3d 183, 189 (1st Cir. 2006) (internal citations and quotation marks omitted).

BlueRadios's tolling argument is predicated on there being an attorney-client relationship, or at least a confidential relationship. D. 244 at 10-11, 19-20. As noted, there is no basis for an attorney-client relationship, and, therefore, BlueRadios must establish that Defendants owed them a duty of disclosure as a nonclient based on a confidential relationship. A duty to a nonclient, however, is less likely to be imposed "where an attorney is also under an independent and potentially conflicting duty to a client." Baker v. Wilmer Cutler Pickering Hale & Dorr LLP, 91 Mass. App. Ct. 835, 846 (2017) (internal citation omitted).

29

Assuming *arguendo* that there was a confidential relationship, the record indicates that the Law Firm had a potential conflict such that the Court declines to impose on Defendants a duty to BlueRadios as a nonclient, particularly after the relationship between Kopin and BlueRadios broke down in 2009. See D. 214-1 at 22-23. Although BlueRadios argues that Kopin's and BlueRadios's interests were aligned when "they agreed to jointly develop the technology" under the Contract and the parties did not anticipate a conflict, BlueRadios also argues that Defendants had a duty to disclose that the Contract created some potential conflicts of interest. See D. 244 at 17-18, 31-32; One Nat. Bank v. Antonellis, 80 F.3d 606, 610 (1st Cir. 1996) (reasoning that potential conflicts of interest can exist even where the particular activity in question "may not be adverse, and may actually be beneficial" but the appropriate inquiry concerns the purpose of the entire legal representation, which includes the duty of confidentiality) (internal citation omitted); Lamare v. Basbanes, 418 Mass. 274, 276-77 (1994) (holding that the attorney owed the plaintiff no duty of care as a nonclient because the plaintiff's interests were adverse to the defendant's interests and owed no duty of care to the plaintiff's children because there was a potential conflict). Here, there is undisputed evidence that BlueRadios was aware of potential conflicts of interest arising from the Contract. For example, in response to an email from Tucker about adding Sample to a patent in December 2008, Parkinson replied that "Kopin wants Kopin . . . on their patents, and wants only BlueRadios folks on your patents." D. 234-91 at 2. The record also demonstrates an actual conflict developed between the parties in July 2009 as BlueRadios noted that Kopin was operating as if there is no Contract and effectively had "abandoned" the Contract. D. 247-1 ¶ 67. Moreover, Thibodeau testified that with respect to the patent application process, BlueRadios's and Kopin's interests were different, D. 247-1 ¶ 114; D. 234-39 at 23, and that there were continued discussions between Kopin and the Law Firm to try to "split" out Kopin's and BlueRadios's claims in 2009.

D. 247-1 ¶ 20; D. 234-43 at 2.  Further, in 2012, the Law Firm and Kopin were discussing potential options for "handling any 'BlueRadios' related claims'" for amending the '646 Application to overcome the USPTO's rejection of the Patent Application, which BlueRadios argues here was against their interests and should have been disclosed.  D. 234-107 at 2; see D. 244 at 20.

The undisputed evidence indicates that there were potential conflicts between BlueRadios's and Kopin's interests, particularly after the breakdown of the relationship in 2009, and, therefore, Defendants did not owe a duty of disclosure to BlueRadios as a nonclient.  See Int'l Strategies Grp., Ltd., 482 F.3d at 13.  Absent a duty of disclosure, fraudulent concealment is "generally not available where the plaintiff is capable of discovering the facts allegedly concealed."  Saenger Org., Inc. v. Nationwide Ins. Licensing Assocs., Inc., 119 F.3d 55, 67 (1st Cir. 1997) (internal citation and quotation marks omitted).  Here, it is undisputed that that the patents were published and the file histories publicly available, and there is record evidence that BlueRadios had patent files in their possession that they sent to Klobucar to review, and therefore, BlueRadios had the means to discover the factual basis for their claims, including any changes in ownership or abandonment.  Id.; Wise, 769 F.2d at 4.

Even assuming arguendo that there was a confidential relationship between BlueRadios and Defendants, and BlueRadios was owed a duty of disclosure, BlueRadios cannot show that fraudulent concealment is applicable because BlueRadios had actual knowledge of potential inconsistencies with the ownership and inventorship.  BlueRadios contends, among other things, that Defendants have not adduced evidence that BlueRadios had actual knowledge of all of Defendants' misconduct, such as, that the Law Firm erroneously added Jacobsen as an inventor on the '627 Application, and excluded Jones.  D. 244 at 11.  The undisputed facts indicate, however, that on March 27, 2009 BlueRadios received from the Law Firm the '627 Application which listed

Jacobsen, but not Jones, as an inventor on the patent application. D. 247-1 ¶ 59b. On April 21, 2009, Kramer sent Choi an executed Declaration for the '627 Application which identified Jacobsen as an inventor. Id. ¶ 59d. On August 20, 2009, the '627 Application was published, listing Jacobsen, and not Jones, as an inventor, and its file history was made public by the USPTO. D. 234-124 ¶ 43b. The '627 Application also issued as a patent on January 15, 2013. D. 247-1 ¶ 38. Moreover, Klobucar's list in November 2014 also indicated that '627 Application included Jacobsen, but not Jones, as an inventor. D. 248-48 at 36-37, 41. As BlueRadios has acknowledged that it was the patent attorneys who would have listed as inventors, D. 234-3 at 39-40, there is no reasonable dispute that BlueRadios had actual notice of their claims. For all these reasons, the tolling doctrines are inapplicable and BlueRadios's claims are untimely.[17]

## B.     The Existence of an Attorney-Client Relationship

Although the claims are time-barred, Defendants and BlueRadios have both moved for summary judgment concerning whether there was an attorney-client relationship between the Law Firm and BlueRadios, and the Court addresses this argument for completeness.[18] D. 212; D. 214-1 at 14-22. "In bringing a legal malpractice claim, [BlueRadios] must prove (i) an attorney-client relationship, which by law imposes a duty on the attorney to exercise care, skill and knowledge in providing legal services to the client; (ii) breach of such duty; and a connection of legally

---

[17] Given the Court's ruling on the statute of limitations, the Court does not reach Defendants' alternative arguments as to the merits of the claims, except for the issue of whether there was an attorney-client relationship. See D. 214-1 at 13-38.

[18] Defendants have also moved for summary judgment specifically as to Cogswell as to legal malpractice claim, arguing that there is no basis for an implied attorney-client relationship as to him because he never communicated with BlueRadios. See D. 214-1 at 38. On this more developed record, summary judgment is appropriate on Count I as to Cogswell for the independent reason that the undisputed facts show that Cogswell never communicated directly with BlueRadios and only became a partner in 2020, years after the alleged malpractice. D. 227-1 at 5; D. 247-1 ¶¶ 90-91; see Williams, 423 Mass. at 480.

recognized causation between the breach and the resulting harm to the client." Weber v. Sanborn, 526 F. Supp. 2d 135, 149 (D. Mass. 2007) (internal citation and quotation marks omitted). "Under Massachusetts law, the existence of an attorney-client relationship is ordinarily a question of fact." Max-Planck-Gesellschaft Zur Foerderung der Wissenschaften E.V. v. Wolf Greenfield & Sacks, PC, 736 F. Supp. 2d 353, 359 (D. Mass. 2010) (concluding on summary judgment that there was an attorney-client relationship). The Court recognizes that "a power of attorney does not ipso facto create an attorney-client relationship." Sun Studs, Inc. v. Applied Theory Assocs., Inc., 772 F.2d 1557, 1568 (Fed. Cir. 1985) (reasoning there was no attorney-client relationship based on effectuating powers of attorney for patent prosecution when one party had the sole discretion to prosecute patent applications).

The parties agree that there was no written or express agreement between BlueRadios and the Law Firm, D. 247-1 ¶ 113; D. 252 ¶ 36, and, therefore, whether there is an attorney-client relationship will depend upon whether BlueRadios can establish that there was an implied attorney-client relationship. "To imply an attorney-client relationship, . . . the law requires more than an individual's subjective, unspoken belief that the person with whom he is dealing, who happens to be *a* lawyer, has become *his* lawyer." Sheinkopf v. Stone, 927 F.2d 1259, 1265 (1st Cir. 1991) (emphasis in original). There is a three-part test to determine whether an implied attorney-client relationship exists:

> (1) a person seeks advice or assistance from an attorney, (2) the advice or assistance sought pertains to matters within the attorney's professional competence, and (3) the attorney expressly or impliedly agrees to give or actually gives the desired advice or assistance. . . . In appropriate cases the third element may be established by proof of detrimental reliance, when the person seeking legal services reasonably relies on the attorney to provide them and the attorney, aware of such reliance, does nothing to negate it.

DeVaux, 387 Mass. at 817–18 (internal citations omitted).  The parties agree that the proper test for an implied attorney-client relationship is DeVaux and the dispute centers around the first and third prongs.  See D. 212 at 6, 11-17; D. 214-1 at 14; D. 251 at 3 n.3.

Here, BlueRadios cannot meet the first prong of the DeVaux test.  Courts have understood the first prong to "require concrete communication by the plaintiff requesting that the attorney represent him, or explicitly seeking individualized legal advisement."  See Int'l Strategies Grp., Ltd., 482 F.3d at 8-9 (holding that plaintiff did not have an implied attorney-client relationship where there was no evidence that plaintiff explicitly requested legal advice).  BlueRadios argues that it can meet the first prong because (1) the Law Firm was engaged to prosecute patents under the Contract and (2) BlueRadios communicated with Defendants regarding the patent prosecutions,  reviewed patent applications and requested to broaden the scope of a claim.  D. 212 at 11-12; D. 244 at 12-13; D. 251 at 3-4.  Neither of these contentions satisfy the first prong.

First, the Contract alone does not establish the first DeVaux prong because courts have interpreted the first prong to require "active communication from the plaintiff to the lawyer requesting legal representation or legal advice."  Int'l Strategies Grp., Ltd. 482 F.3d at 8-9 (citing cases); see Sheinkopf, 927 F.2d at 1268 (concluding that there was no implied attorney-client relationship where the undisputed facts indicated that plaintiff, among other things, "never explicitly requested [attorneys] to represent him"); DaRoza v. Arter, 416 Mass. 377, 381-82 (1993) (reasoning that establishing the first prong requires plaintiff to expressly seek the advice or assistance of the attorneys).  BlueRadios counters that the first prong of the DeVaux test does not require express legal assistance and can be established by implied requests evidenced by BlueRadios communicating directly with the Law Firm concerning patent applications and through Jacobsen.  D. 244 at 13-14.  BlueRadios relies upon Mass. Eye & Ear Infirmary v. QLT

34

<u>Phototherapeutics, Inc.</u>, 167 F. Supp. 2d 108, 110 (D. Mass. 2001), in which another session of this court analyzed on a motion to compel whether certain documents were properly withheld based on attorney-client privilege.  <u>Id.</u>  The court concluded that the common interest exception applied to documents relating to certain patent applications but did not apply to documents that related to licensing agreements.  <u>Id.</u> at 125-27.  In particular, the court reasoned that it was objectively reasonable for the plaintiff to assume that an attorney-client relationship was established in relation to prosecution of a certain patent because the plaintiff had initiated a communication to the attorney that was marked "Confidential," provided information on a patent project and suggestions for patent coverages, which the court interpreted as effectively requesting legal advice on preparing a patent application.  <u>Id.</u> at 117-18, 121.  The court, however, held that the plaintiff did not have an attorney-client relationship concerning licensing of a different patent because "[plaintiff] has not shown that [the attorney's] statements were given in response to [plaintiff's] request for legal advice on the licensing matters."  <u>Id.</u> at 123.  Here, the undisputed facts indicate that BlueRadios contracted its ability to determine what patents would be prosecuted to Kopin under the Contract, D. 247-1 ¶¶ 30-31; D. 213-26 at 5; D. 252 ¶ 13b.[19]  Moreover, although BlueRadios's reliance upon the Contract may support its reliance argument for the third prong, it does not establish the requisite request for legal advice required under the first prong of <u>DeVaux</u>.  <u>See</u> <u>DaRoza</u>, 416 Mass. at 381-82 (reasoning that plaintiff's reliance upon two actions by attorneys to show an implied attorney-client relationship "might have pertinence to the third

_____

[19] BlueRadios's reliance upon <u>Wolf Greenfield & Sacks</u>, 736 F. Supp. 2d at 359-60, does not warrant a different conclusion.  D. 212 at 11; D. 244 at 12.  Unlike here, the plaintiff there adduced evidence that he had identified himself as one of the law firm's "clients" and requested specific legal advice several times regarding a patent prosecution.  <u>Wolf Greenfield & Sacks</u>, 736 F. Supp. 2d at 359-60.

element of the <u>DeVaux</u> test, they cannot satisfy the first element" because neither action involved the plaintiff seeking advice or assistance from the attorneys).

Second, BlueRadios's communications with Defendants do not establish individualized requests for legal advice. Although BlueRadios argues that it did request legal advice because the Law Firm spoke to BlueRadios about "possible new patent disclosures" and BlueRadios requested that the Law Firm broaden claims in the '627 Application to include WiFi enablement, provided revisions to certain patent applications and BlueRadios discussed with the Law Firm "possible areas of patentability," D. 212 at 12; D. 251 at 3-4, these facts are insufficient because they are not individualized requests for legal advice. See <u>Sheinkopf</u>, 927 F.2d at 1265 (reasoning that plaintiff failed to adduce evidence of an implied attorney-client relationship because "the record is barren of any evidence that [plaintiff] explicitly requested legal advice from [the attorney]" and "[i]t is equally devoid of any direct indication that [the attorney] ever considered [plaintiff] to be his, or a [Law Firm], client (or treated him as such)" and neither the law firm or individual attorney ever billed the plaintiff for legal services); <u>Robertson v. Gaston Snow & Ely Bartlett</u>, 404 Mass. 515, 522-23 (1989) (reasoning that there was no implied attorney-client relationship because there was no evidence that the plaintiff requested the attorney personally represent him in the matter at issue, never was told that the attorney would protect his interests, and was never billed for any services); <u>Furtado v. Oberg</u>, No. 15-cv-312-JJM-LDA, 2019 WL 430893, at *4 (D.R.I. Feb. 4, 2019), <u>aff'd on other grounds</u>, 949 F.3d 56 (1st Cir. 2020) (reasoning that there was no implied attorney-client relationship because there was "no evidence of any individualized advice" given to the plaintiff by the attorney). It is undisputed that "BlueRadios did not make any individual requests for [Defendants] to perform discreet tasks," D. 247-1 ¶ 30; D. 213-26 at 5, BlueRadios was not invoiced by the Law Firm for any legal services, D. 252 ¶ 36, and did not voice that it considered

36

the Law Firm to be its counsel prior to the Colorado lawsuit where it sought to disqualify the Law Firm from representing Kopin.  Id. ¶ 66.  On this record, absent active communication from BlueRadios requesting individualized legal advice or request for legal representation, BlueRadios has failed to adduce evidence that there is a genuine dispute that an implied attorney-client relationship was formed.[20]

## VI.  Conclusion

For the foregoing reasons, the Court ALLOWS Defendants' motion for summary judgment, D. 209, DENIES BlueRadios's partial motion for summary judgment on the issue of an attorney-client relationship, D. 208, and DENIES BlueRadios's partial motion for summary judgment on the issue of contract termination, D. 204, as moot.

**So Ordered.**

/s Denise J. Casper
United States District Judge

---

[20] Given the Court's holding as to the first prong, the Court does not reach the parties' additional arguments on whether the third prong of DeVaux is satisfied.  See DaRoza, 416 Mass. at 381 (recognizing that "[a]ll three requirements of [the DeVaux] test must be met to establish the relationship," and concluding no implied attorney-client relationship was formed because plaintiff could not establish the first prong of the DeVaux test).

37

# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

**BLUERADIOS, INC.**
               Plaintiff(s)

        v.                                    CIVIL ACTION NO. **21-10488-DJC**

**HAMILTON, BROOK, SMITH & REYNOLDS, P.C., ET AL**
                    Defendant(s)

## JUDGMENT IN A CIVIL CASE

<u>CASPER, D.J.</u>

☐    **Jury Verdict.** This action came before the court for a trial by jury. The issues have been tried and the jury has rendered its verdict.

X    **Decision by the Court.** In accordance with the Memorandum and Order dated September 18, 2024, D. 268;

             **IT IS ORDERED AND ADJUDGED**

             Judgment for the defendants.

                                     Robert M. Farrell, Clerk

Dated:  September 18, 2024                   /s/ Lisa M. Hourihan
                                         ( By ) Deputy Clerk